**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NORTHERN AIR CARGO**<br>**3900 Old International Airport Road**<br>**Anchorage, AK 99502,**<br><br>**TATONDUK OUTFITTERS LTD.**<br>**d/b/a EVERTS AIR CARGO**<br>**5525 Airport Industrial Road**<br>**Fairbanks, AK 99709, and**<br><br>**LYNDEN AIR CARGO LLC**<br>**6441 South Airpark Place**<br>**Anchorage, AK 99502,**<br><br>     *Plaintiffs,*<br><br>v.<br><br>**UNITED STATES POSTAL SERVICE**<br>**475 L'Enfant Plaza, S.W.**<br>**Washington, DC 20260,**<br><br>     *Defendant.* | CASE NO. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

For their Complaint against Defendant United States Postal Service ("Postal Service"), Plaintiffs Northern Air Cargo ("NAC"), Tatonduk Outfitters Ltd. d/b/a Everts Air Cargo ("Everts"), and Lynden Air Cargo LLC ("Lynden") (collectively, "Plaintiffs" or "Existing Mainline Carriers"), by and through counsel, hereby allege as follows:

### NATURE OF THE CASE

This is an action for declaratory and injunctive relief. Plaintiffs ask the Court to enjoin the Postal Service from tendering nonpriority mainline bypass mail to Peninsula Airways, Inc. ("PenAir") in five requested markets because PenAir is not an eligible carrier under 39 U.S.C. § 5402(g)(5)(C) ("Section 5402(g)(5)(C)"). PenAir has not operated for 12 consecutive months

with aircraft having a payload capacity of greater than 7,500 pounds. Moreover, it began providing bypass mail service prior to January 1, 2001 and therefore is not a "new" carrier. The Postal Service's decision to tender nonpriority mainline bypass mail to PenAir exceeds the scope of its delegated authority, irreparably harms the Plaintiffs, and jeopardizes the stability of the Intra-Alaska Bypass Mail System.

## PARTIES

1.      Plaintiff NAC is an Alaskan corporation headquartered in Anchorage, Alaska. Originally founded in 1956, NAC has been serving Alaskan communities for over 50 years. Today, it has scheduled all-cargo flights to numerous destinations in Alaska. In the spring of 2007, NAC upgraded its fleet by acquiring three Boeing 737-200 aircraft that can carry up to 30,000 pounds of payload. NAC uses these aircraft to carry intra-Alaska nonpriority mainline bypass mail. The Boeing 737-200 aircraft has a large 81-inch by 134-inch side-loading cargo door, which allows large outsized freight to be loaded on scheduled service flights, and hard flooring, which allows the aircraft to carry particularly heavy cargo.

2.      Plaintiff Everts is an Alaskan corporation headquartered in Fairbanks, Alaska. Everts has served Alaska since 1995 and currently provides scheduled air cargo service to twelve major markets in Alaska. Everts carries intra-Alaska nonpriority mainline bypass mail on DC-6 freighters and C-46 aircraft. It also carries some nonpriority mainline bypass mail on Embraer 120 aircraft, although this bulk-load aircraft is primarily used to transport priority mail and freight. The DC-6 aircraft have a payload capacity of up to 30,000 pounds; the C-46 aircraft have a payload capacity of up to 14,000 pounds; and the Embraer 120 aircraft have a payload capacity of up to 8,000 pounds. The DC-6 and C-46 aircraft have specially configured cargo doors that allow for the easy loading of outsized cargo and palletized bypass mail.

3.      Plaintiff Lynden is an Alaskan limited liability company headquartered in Anchorage, Alaska.  Lynden has served as a mainline carrier for twelve years, since 1997. Lynden operates a fleet of six L382 Hercules freighters, two of which it operates in Alaska on a full-time basis.  The L382 Hercules aircraft have a payload capacity of up to 48,000 pounds and are ideal for transporting heavy cargo to Alaska's more remote communities because the Hercules can land on packed earth, gravel, ice or short runways.  The Hercules' cargo hold is 55 feet long, 10 feet wide, and 9 feet high, and there is a rear-loading door that allows straight-in cargo loading for items as long as 55 feet.

4.      Defendant Postal Service is an independent establishment of the executive branch of the Government of the United States residing in the District of Columbia.  One of its duties is to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees."  39 U.S.C. § 403(a).  The Postal Service is also responsible for providing mail service to the entire population of the United States.  *Id.*

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1339 and 39 U.S.C. § 409(a).

6.      Venue is proper under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

7.      The Postal Service's decision to tender nonpriority mainline bypass mail to PenAir jeopardizes the viability of the Intra-Alaska Bypass Mail System.

8.      Congress created the Intra-Alaska Bypass Mail System to address the unique challenges associated with transporting mail and other cargo in the State of Alaska.  Despite being the largest state in the union, Alaska has a very limited system of roads and railways

connecting its communities.  The United States Government owns nearly two-thirds of Alaska's landmass and has forbidden Alaskans from building roads or railways on much of this land. Accordingly, most communities and a large portion of the population within Alaska can only be reached by air.  This means that many in Alaska rely on air transportation not only for passenger service but also to receive food, goods, and basic consumer necessities.  The Postal Service also relies on air transportation in Alaska to meet its obligations to deliver mail to every residence and business in Alaska.

9.     Bypass mail is bulk mail consisting of a wide range of commodities that are delivered directly from the shippers' facilities to the airlines' freight terminals and then placed directly on aircraft for onward movement.  Bypass mail, therefore, never passes through the Postal Services' facilities, and for this reason, is referred to as "bypass mail."  Bypass mail includes virtually all types of freight normally carried by surface transportation, such as building supplies, perishables, and food stuffs.

10.     The volume of bypass mail transported in the intra-Alaska market is far greater than any other type of mail, and, accordingly, the bypass mail payments received by the carriers represent significant portions of their total revenues.

11.     Over the years, Congress has demonstrated a strong federal interest in promoting both mail and non-mail (*i.e.*, passenger and commercial freight) air service to Alaskan communities.  Indeed, Congress created the Intra-Alaska Bypass Mail System to:

(A)     provide the most affordable means of delivering food and everyday necessities to rural and isolated communities;

(B)     establish a system where the Postal Service can meets its obligations to deliver mail to every house and business in America;

(C)     support affordable and reliable passenger service; and

(D)     support affordable and reliable non-mail freight service.

H.R. 4661, 107th Cong. § 1(b)(9)(A)-(D) (2002).

12.    In August 2002, Congress passed the Rural Service Improvement Act of 2002 ("RSIA"), which  made significant changes to the Intra-Alaska Bypass Mail System.  These changes were necessary because "some carriers ha[d] been manipulating the system by carrying few, if any, passengers and little non-mail freight while earning most of their revenues from the carriage of nonpriority bypass mail."  H.R. 4661, 107th Cong. § 1(b)(11) (2002).

13.    Noting the need for the changes set forth in the RSIA, Senator Ted Stevens stated: "In recent years there has been an explosion in the number of carriers eligible to carry bypass mail in Alaska because the threshold requirements for eligibility have been very low.  However, few of these new carriers operate in ways that reflect the intent behind the bypass mail program. Instead of providing air transportation to passengers, these carriers use the system to underwrite a portion of their total business plan.  Other mail-only carriers use it as a basis of their entire operation.  They provide little or no passenger service to Alaska's rural communities."  148 Cong. Rec. S7263 (July 24, 2002) (statement of Sen. Stevens).

14.    Accordingly, Congress passed the RSIA:

(A)    to ensure that the Intra-Alaska Bypass Mail system remains strong, viable, and affordable for the Postal Service;

(B)    to ensure that residents of rural and isolated communities in Alaska continue to have affordable, reliable and safe passenger service;

(C)    to ensure that residents of rural and isolated communities in Alaska continue to have affordable, reliable, and safe non-mail freight service;

(D)    to encourage that intra-Alaska air carriers move toward safer, more secure, and more reliable air transportation under the Federal Aviation Administration's guidelines and in accordance with part 121 of title 14, Code of Federal Regulations, where such operations are supported by the needs of the community; and

(E)    that Congress makes changes to the Intra-Alaska Bypass Mail system to encourage intra-Alaska air carriers to begin operating under part 121,

where applicable, and to ensure that the Intra-Alaska Bypass Mail system continues to be used to support substantial passenger and non-mail freight service.

H.R. 4661, 107th Cong. § 1(b)(12)(A)-(E) (2002).

15.     In short, the RSIA strengthened and reaffirmed Congress' intent that bypass mail revenues should not be used only to pay for the delivery of mail, but also to support a reliable network of scheduled passenger and freight service to Alaska's communities.

16.     The RSIA divides the carriers of bypass mail into two categories:   mainline carriers and bush carriers.  Mainline carriers operate large aircraft (greater than 7,500 pound payload capacity) primarily in and out of Anchorage and Fairbanks, on the one hand, and regional hubs on the other.  The bush carriers operate smaller aircraft (less than 7,500 pound payload capacity) between regional hubs and Alaska's smaller, rural communities.

17.     To achieve the stated goals of the RSIA, Congress limited eligibility for the tender of nonpriority mainline bypass mail to the four existing mainline bypass mail carriers that were also providing substantial passenger or freight service with large aircraft operated under part 121 of title 14, Code of Federal Regulations ("Part 121"), as of January 1, 2001.  These four carriers include the three Plaintiffs in this lawsuit (NAC, Everts, and Lynden) plus Alaska Airlines.  Under the RSIA, other carriers are allowed to participate only if the mainline service is deemed inadequate or if a new entrant offers substantial passenger service using large aircraft operated under Part 121 and also satisfies a number of other requirements.

18.     NAC, Everts and Lynden have all invested a significant amount of money and resources into providing air transportation to Alaska's isolated communities.  NAC, Everts and Lynden each have aircraft with at least 30,000 pounds of payload capacity.  NAC operates a fleet of Boeing 737-200 freighters with a payload capacity of 30,000 pounds; Lynden operates a fleet of L382 Hercules freighters capable of landing on unimproved air strips, with a payload capacity

of 48,000 pounds; and Everts operates a fleet of DC-6 freighters with a payload capacity of 30,000 pounds.

19.     The large freighters Plaintiffs operate each have specially configured cargo doors that allow for the easy loading and unloading of palletized mail and outsized freight, such as lumber, snowmobiles, boats, four wheelers and other large commodities that are essential for the residences and businesses in the rural, isolated Alaskan communities.  In addition, NAC and Everts are two of only several airlines within Alaska currently permitted to transport medically-necessary oxygen cylinders to rural Alaskan communities.

20.     In short, each of the Plaintiffs has demonstrated a strong and continuing commitment to serving Alaska's rural and isolated communities by not only providing mail service, but just as significantly providing substantial non-mail freight service.  In passing the RSIA, Congress found the four existing mainline carriers to be eligible to continue carrying nonpriority mainline bypass mail.  Congress did this in recognition of the importance of maintaining a financially viable network of mainline carriers to satisfy Congress' overarching objective of ensuring reliable, stable, and efficient passenger, freight, and mail service to Alaska's communities.

21.     Following passage of the RSIA, two carriers that did not qualify as existing mainline carriers challenged the constitutionality of certain conditions precedent for new entry and definitions in the RSIA.  In upholding the constitutionality of the definition of "existing mainline carrier," the United States District Court for the District of Alaska held that "it is rational and reasonable for Congress to have believed that four carriers sharing the mainline nonpriority bypass mail would sustain a more stable and economically healthy system than to allow further dilution of the mail revenue."  *Alaska Central Express, Inc. v. United States of*

*America,* Case No. A02-0106 CV (JKS), at 10 (D. Ala. Sept. 29, 2003), *aff'd,* 2005 U.S. App. LEXIS 17439 (9th Cir. Aug. 15, 2005).

22.     Allowing a carrier like PenAir, with others all but certain to follow, to enter the mainline bypass mail market without satisfying the RSIA requirements of substantial passenger service on large aircraft under Part 121 will significantly dilute the mail revenues of the Existing Mainline Carriers.  Dilution of the mainline bypass mail revenues will lead to a return to the highly uncertain and chaotic financial and market conditions, which were the predicate for the enactment of the RSIA.

23.     Under the RSIA, eligible mainline carriers, offering reliable scheduled service and meeting frequency requirements, do not compete for bypass mail; they receive an equitable tender of mail in a particular market and are paid by the Postal Service at rates established by the Department of Transportation.

24.     To stabilize mainline markets and create increased passenger service, the RSIA amended 39 U.S.C. § 5402 to address, among other things, the requirements for a new mainline passenger carrier to receive an equitable tender of nonpriority mainline bypass mail on a route if there are no mainline passenger carriers providing service on the route.  Specifically, the RSIA provided in Section 5402(g)(5)(C):

> Notwithstanding subparagraph (A) and paragraph (1)(B), a new 121 mainline passenger  carrier, otherwise qualified under this subsection, may immediately receive equitable tender of nonpriority mainline bypass mail to a hub point in the State of Alaska if the carrier meets the requirements of subparagraphs (A), (C), and (D) of paragraph (1) and subsection (h)(2)(B) and --
>
> (i)     all qualified 121 mainline passenger carriers discontinue service on the city pair route; or
>
> (ii)    no qualified 121 mainline passenger carrier serves the city pair route.

25.     Under Section 5402(g)(5)(C) of the RSIA, to receive an equitable tender of nonpriority mainline bypass mail when no 121 mainline passenger carrier is providing service on the city pair route, a 121 mainline passenger carrier must:  (1) meet the requirements of (g)(1)(A), (C), (D) and (h)(2)(B); and (2) satisfy the definition of "new."

**The Requirements of Section 5402(g)(1)(A), (C), and (D) and (h)(2)(B)**

26.     The RSIA amended Section 5402 to provide:

(g) (1)  The Postal Service, in selecting carriers of non-priority bypass mail to any point served by more than one carrier in the State of Alaska, shall adhere to an equitable tender policy within a qualified group of carriers, in accordance with the regulations of the Postal Service, and shall, at a minimum, require that any such carrier shall--
   (A)     hold a certificate of public convenience and necessity issued under section 41102(a) of title 49;
   (B)     operate at least 3 scheduled flights each week to such point;
   (C)     exhibit an adherence to such scheduled flights; and
   (D)     have provided scheduled service with at least 3 scheduled (noncontract) flights per week between two points within the State of Alaska for at least 12 consecutive months with aircraft--
      (i)      up to 7,500 pounds payload capacity before being selected as a carrier of nonpriority bypass mail at an applicable intra-Alaska bush service mail rate; and
      (ii)     over 7,500 pounds payload capacity before being selected as a carrier of nonpriority bypass mail at the intra-Alaska mainline service mail rate.

27.     In 2004, Section 5402(g)(1) was amended by:  (1) renumbering (g)(1)(A) - (D) as (g)(1)(A)(i) - (iv) with slight modifications; (2) decreasing from 3 to 2 the number of scheduled flights required per week for aircraft with over 7,500 pound payload capacity; and (3) giving the Postal Service discretion to increase the number of scheduled flights required per week for aircraft with over 7,500 pound payload capacity and to establish the days of such service. Accordingly, today, Section 5402(g)(1) reads as follows:

(g)(1)(A)   The Postal Service, in selecting carriers of nonpriority bypass mail to any point served by more than 1 carrier in the State of Alaska, shall adhere to an equitable

tender policy within a qualified group of carriers, in accordance with the regulations of
the Postal service, and shall, at a minimum, require that any such carrier --

    (i)      hold a certificate of public convenience and necessity issued under section
            41102(a) of title 49;

    (ii)     operate at least to such point at least the number of scheduled flights each
            week established under subparagraph (B)(i)

    (iii)    exhibit an adherence to such scheduled flights; and

    (iv)    have provided scheduled service with at least the number of scheduled
            noncontract flights each week established under subparagraph (B)(ii)
            between 2 points within the State of Alaska for at least 12 consecutive
            months with aircraft--

        (I)     up to 7,500 pounds payload capacity before being selected as a
                carrier of nonpriority bypass mail at an applicable intra-Alaska
                bush service mail rate; and

        (II)    over 7,500 pounds payload capacity before being selected as a
                carrier of nonpriority bypass mail at the Intra-Alaska mainline
                service mail rate.

(B)(i)   for purposes of subparagraph (A)(ii) --

        (I)     for aircraft described under subparagraph (A)(iv)(I) the number is
                3; and

        (II)    for aircraft described under subparagraph (A)(iv)(II), the number is
                2, except as may be provided under subparagraph (C).

  (ii)   For purposes of subparagraph (A)(iv)--

        (I)     for aircraft described under subparagraph (A)(iv)(I) the number is
                3; and

        (II)    for aircraft described under subparagraph (A)(iv)(II), for any week
                in any month before the effective date of the Rural Air Service
                Improvement Act of 2004, the number is 3, and after such date, the
                number is 2.

(C)     The Postal Service, after consultation with affected carriers, may establish for
        service by aircraft described under subparagraph (A)(iv)(II)--

    (i)      a larger number of flights than required under subparagraph (B)(i); or

    (ii)     the days that service will operate.

28.     Section 5402(h)(2)(B)(i) provides that "for operations under part 121, [a carrier]

must operate aircraft type certificated to carry at least 19 passengers."

## Definition of "New"

29.     The RSIA defined "new" when referencing a new entrant carrier as a carrier that:

    (A)    meets the respective requirements of clause (i) or (ii) of subsection
           (g)(1)(D), depending on the type of route being served and the size of
           aircraft being used to provide service; and

    (B)    began providing nonpriority bypass mail service on a city pair route in the State of Alaska after January 1, 2001.

30.    In 2006, the definition of "new" was amended to add an additional requirement for a carrier to be considered "new" and to recognize the renumbering changes that occurred in Section 5402(g)(1). Thus, today, "new" means a carrier that:

    (A)    meets the respective requirements of subclause (I) or (II) of subsection (g)(1)(A)(iv), depending on the type of route being served and the size of aircraft being used to provide service;

    (B)    began providing nonpriority bypass mail service on a city pair route in the State of Alaska after January 1, 2001; and

    (C)    is not comprised of previously qualified existing mainline carriers as a result of a merger or sale;

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF

31.    On or about July 6, 2009, PenAir requested an equitable tender of nonpriority mainline bypass mail pursuant to 39 U.S.C. § 5402(g)(5)(C) in the following two markets: Anchorage-Dillingham and Anchorage-King Salmon.

32.    On or about July 22, 2009, PenAir supplemented its July 6th request regarding the tender of nonpriority mainline bypass mail pursuant to 39 U.S.C. § 5402(g)(5)(C) in the Anchorage-Dillingham and Anchorage-King Salmon markets.

33.    On information and belief, PenAir subsequently requested an equitable tender of nonpriority mainline bypass mail pursuant to 39 U.S.C. § 5402(g)(5)(C) in three additional intra-Alaska markets: Anchorage-Aniak; Anchorage-McGrath; and Anchorage-Unalakleet.

34.    On or about August 7, 2009, the Postal Service determined that PenAir was eligible for an equitable tender of nonpriority mainline bypass mail pursuant to 39 U.S.C. § 5402(g)(5)(C) in the following two intra-Alaska markets:  Anchorage-Dillingham and Anchorage-King Salmon.  A copy of the Postal Service's August 7, 2009 determination is

attached as Exhibit A.   On information and belief, the Postal Service has indicated that its determination also covers the Anchorage-Aniak, Anchorage-McGrath, and Anchorage-Unalakleet markets.

35.     In its request to the Postal Service to receive equitable tender under Section 5402(g)(5)(C), PenAir represented that it intends to have a Saab 340 freighter carry mainline bypass mail and that it will carry passengers on a Saab 340 passenger aircraft.  PenAir, however, did not explain in its request how many scheduled flights each week in these markets will be for mail, how many will be for passengers, what the seating capacity will be on its passenger flights, or whether all or just some of these flights will be operated with an aircraft that has a payload capacity of more than 7,500 pounds.

36.     On information and belief, in an effort to comply with the requirement that "121 mainline passenger carriers" operate aircraft with more than 7,500 pounds of payload capacity, PenAir has either recently reconfigured at least two of its Saab 340 aircraft or obtained additional Saab 340 aircraft.  PenAir intends to operate these recently reconfigured or new Saab 340 aircraft -- one with an all cargo configuration and one with a configuration of at least 19 passenger seats -- in the five markets at issue.

37.     In its July 6th letter, PenAir acknowledged that it has been flying the Saab 340 aircraft for many years in Alaska.  However, for these many years, PenAir has not been flying the Saab 340 aircraft as a mainline carrier.  To the contrary, it has been flying the Saab 340 aircraft as a bush carrier.

38.     A "bush carrier" is defined in Section 5402 as "a carrier operating aircraft certificated within the payload capacity requirements of subsection (g)(1)(A)(iv)(I) on a city pair

route."   Subsection (g)(1)(A)(iv)(I) applies to aircraft with "up to 7,500 pounds payload capacity."

39.     Thus, to qualify as a bush carrier in a given city pair market under Section 5402, a carrier's aircraft cannot have a payload capacity in excess of 7,500 pounds.

40.     Indeed, PenAir has repeatedly represented under oath in its monthly T-100 submissions to the Department of Transportation that both its Saab 340A and Saab 340B model aircraft have a payload capacity of less than 7,500 pounds in various intra-Alaska markets, including the same five markets in which PenAir is now seeking mainline bypass mail.  The Department of Transportation, in turn, has used PenAir's Saab 340 data submissions to formulate the nonpriority bush mail rates paid to all Part 121 bush bypass mail carriers, including PenAir, in the State of Alaska.

41.     In addition, by representing that its Saab 340 aircraft have a payload capacity of less than 7,500 pounds and holding itself out as a bush carrier, PenAir has been compensated by the Postal Service at the bush rate for carrying nonpriority bypass mail on its Saab 340s.  The bush rate is substantially higher than the mainline rate.

42.     PenAir is now claiming that the same aircraft that PenAir has repeatedly represented as having a payload capacity of less than 7,500 pounds now have a greater than 7,500 pound payload capacity.  PenAir, however, does not meet the new entrant mainline bypass mail requirements of Section 5402, and it most certainly should not be allowed to "game" the system in this manner.

**PenAir Does Not Satisfy the Requirements of 39 U.S.C. § 5402(g)(5)(C)**

43.     Section 5402(g)(5)(C) requires PenAir to meet the requirements of Section 5402(g)(1)(A), (C), and (D).

44.     Section 5402(g)(1)(A)(iv) -- originally enacted as Section 5402(g)(1)(D) -- requires PenAir to provide scheduled service between two points in the State of Alaska for at least 12 consecutive months with aircraft of over 7,500 pounds payload capacity.

45.     PenAir has not satisfied Section 5402(g)(1)(A)(iv); it has not provided scheduled service between two points in the State of Alaska for at least 12 consecutive months with aircraft having over 7,500 pounds of payload capacity.

46.     To the contrary, the scheduled service that PenAir has provided within the last 12 months has been with aircraft having a payload capacity of less than 7,500 pounds.  PenAir has represented under oath that the payload capacity of the Saab 340s in all five of the markets at issue was less than 7,500 pounds.

47.     In addition, PenAir has carried nonpriority bush bypass mail within the last 12 months using the same aircraft (Saab 340s) that it now contends have over 7,500 pounds of payload capacity.  When carrying the nonpriority bush bypass mail on this aircraft, it has represented to the Department of Transportation and to the Postal Service that the aircraft has a payload capacity of less than 7,500 pounds to ensure that PenAir receives the far higher bush rates for carrying bypass mail.

48.     As PenAir has acknowledged, it has flown Saab 340s in Alaska for years, and for years, it has flown these Saab 340s solely as a bush carrier.  It would be contrary to the plain language of Section 5402(g)(1)(A)(iv) and the intent behind the RSIA if the Postal Service were now permitted to find that PenAir's experience flying the Saab 340 aircraft as a bush carrier with a payload capacity of less than 7,500 pounds now somehow qualifies PenAir to receive mainline bypass mail.

49.     Indeed, the fact that PenAir has either had to reconfigure its Saab 340 aircraft or obtain new Saab 340 aircraft in an effort to qualify as a mainline carrier operating aircraft with over 7,500 pounds of payload capacity proves that the Saab 340A and Saab 340B models that PenAir has been operating -- including those operated within the 12 months prior to its request to the Postal Service for a tender of mainline bypass mail -- have a payload capacity of less than 7,500 pounds.

### PenAir Does Not Satisfy the Definition of "New"

50.     In order to be considered a "new" carrier for purposes of Section 5402(g)(5)(C), among other requirements, the carrier must have begun providing nonpriority bypass mail service on a city pair route in the State of Alaska after January 1, 2001.

51.     PenAir began providing nonpriority bush bypass mail service on city pair routes in the State of Alaska well before January 1, 2001.  Accordingly, PenAir does not satisfy the second requirement of the definition of "new" under Section 5402(g)(5)(C).

### Plaintiffs Will Be Irreparably Harmed If An Injunction Does Not Issue

52.     The RSIA was enacted to ensure a viable and strong mail distribution system in Alaska.  Congress determined that a viable and strong mail distribution system required a healthy and stable mainline bypass mail market.  Accordingly, Congress limited participation in the system to the existing mainline carriers, which had demonstrated a longstanding commitment to the isolated communities of Alaska by investing significant amounts of money in large aircraft that allowed these existing carriers to provide consistent, reliable, and substantial passenger and non-mail freight services.

53.     The RSIA was enacted to restore much-needed stability to the Alaska bypass mail distribution system.  Prior to the RSIA, there were several bush carriers, using small aircraft,

which started providing mainline bypass mail service in a large number of markets without offering any passenger or non-mail freight service.   Larger aircraft are generally more cost efficient and thereby lead to lower Department of Transportation-established mail rates and, in turn, Postal Service payments to the carriers.  However, as a result of the dilution of the volume of mainline bypass mail by the smaller bush carriers, several of the mainline carriers encountered serious financial difficulties, and their ability to sustain their scheduled service obligations became questionable.   For this reason, the mainline bypass mail provisions of the RSIA require that new carriers of mainline bypass mail must provide substantial passenger service on large aircraft -- so as to ensure that any new entry will be accompanied by significant, incremental service benefits.

54.    Specifically, to maintain the stability and the health of the mainline bypass mail market, Congress determined that before a new carrier could enter the mainline bypass mail market, it must provide significant passenger service on large aircraft for at least one year prior to the receipt of any mainline bypass mail.  PenAir has not satisfied this requirement.

55.    Allowing PenAir to receive equitable tender of mainline bypass mail without satisfying the requirements of Section 5402(g)(5)(C) will bring about a return to the pre-RSIA uncertain and financially debilitating market conditions and irreparably harm the Plaintiffs.

56.    Currently, NAC, Everts, and Lynden receive equitable tender of mainline bypass mail in the Anchorage-Dillingham market.  In the Anchorage-King Salmon, Anchorage-Aniak, and Anchorage-Unalakleet markets, NAC and Everts receive equitable tender of mainline bypass mail, and in the Anchorage-McGrath market, NAC receives the tender of mainline bypass mail. In the summer months, Alaska Airlines receives equitable tender of mainline bypass mail in the Anchorage-Dillingham and Anchorage-King Salmon markets.

57.     If PenAir, as the Postal Service's approval contemplates, receives an equitable tender in these five markets, in two of the markets (Anchorage-Aniak and Anchorage-Unalakaleet), NAC's and Everts' share of bypass mail would decrease from 50% of the mainline bypass mail to approximately 33%.  In the Anchorage-King Salmon markets, NAC's and Everts' shares would drop from 50% to 33% in the off-peak months and to 25% in the peak months when Alaska Airline is providing passenger service.  In the Anchorage-Dillingham, the shares of each of Lynden, NAC, and Everts would drop from 33% to 25% in the off-peak months and to 20% in the peak months when Alaska Airlines is providing passenger service.  In the Anchorage-McGrath market, NAC would lose 50% of the mainline bypass mail in that market.

58.     These decreases in the volume of mail to be carried by the Plaintiffs would lead to corresponding decreases in revenue.  Because nonpriority mainline bypass mail is equitably tendered to eligible carriers in each particular market, if PenAir were tendered mainline bypass mail in the requested markets, Plaintiffs would necessarily receive less mainline bypass mail and accordingly incur significant decreases in mainline bypass mail revenue.  The loss of mainline bypass mail revenue will be substantial; each of the three Plaintiffs will lose more than $1 million of revenue on an annual basis.

59.     However, Plaintiffs will lose more than just bypass mail revenue.  For example, Lynden anticipates being forced to leave the Anchorage-Dillingham market if its share of nonpriority mainline bypass mail is reduced in this market.  That means that Lynden will lose not only its bypass mail revenue but also its freight revenue, which could total over $1.5 million on a yearly basis.  It will also likely have to terminate employees, and at this time, Lynden is uncertain if it can successfully redeploy its Hercules to another market, either within Alaska or elsewhere.

60.     Similarly, NAC and Everts will likely be forced to cancel flights or reduce the number of weekly flights in the markets PenAir intends to enter.  Any such reduction in flights has deleterious impacts beyond loss of mail revenue.  First, NAC and Everts carry non-mail freight on the same flights that they carry nonpriority mainline bypass mail and will consequently experience a proportionate loss of freight revenue.

61.     Second, with the operation of fewer flights with aircraft suitable for the carriage of outsized cargo, hazardous materials, and compressed oxygen canisters, Alaska's regional hubs and rural communities stand to be severely impacted.  PenAir's Saab 340 aircraft cannot carry outsized cargo shipments or the compressed oxygen canisters, which only NAC, Everts and Alaska Airlines are currently authorized to transport within Alaska.  More particularly, these oxygen canisters are essential for the operation of a number of medical facilities located in Alaska's rural communities.

62.     Third, with fewer flights, Plaintiffs may have to layoff employees, including crew members.

63.     Fourth, third-party agents that Plaintiffs hire at the hub points to assist with loading and unloading cargo and mail from the planes will also be impacted by fewer flights. Residents of the regional hub communities, who currently serve as ground handling and storage agents for Plaintiffs, heavily rely on the compensation paid to them by Plaintiffs.  Those individuals stand to be seriously impacted if there is a material reduction in frequencies by the existing Mainline Carriers.

64.     The impact to Plaintiffs in the absence of injunctive relief far outweighs any impact to the Postal Service if the Court were to grant an injunction and maintain the status quo. In the absence of injunctive relief, Plaintiffs will incur costs and suffer nonrecoverable economic

losses.  The Postal Service, on the other hand, will not be adversely impacted by an injunction maintaining the status quo.  The mainline bypass mail in the five markets at issue will continue to be carried by Plaintiffs, as it has been for decades, and the Postal Service will not incur any additional costs.

65.     Indeed, Plaintiffs believe that the Postal Service's costs will actually increase if PenAir is tendered mainline bypass mail.  First, the entry of an additional carrier necessarily increases the Postal Service's administrative burdens associated with monitoring and paying for mainline mail service in that market.  Second, the carriage of mainline bypass mail by PenAir means that the financial costs of the Saab 340 aircraft will now be transferred by the Department of Transportation from the bush rate cost pool to the mainline rate cost pool.  However, since the Saab 340 is far smaller than virtually any of the aircraft currently operated by Plaintiffs, the higher financial unit costs associated with the operation of the Saab 340 will correspondingly increase the average unit cost in the mainline cost pool.  That increase will necessarily lead to higher mainline mail rates, and therefore, increase the mainline mail rates the Postal Service will have to pay to all mainline carriers throughout the State of Alaska.

66.     The public interest will also be served by an injunction maintaining the status quo.  The public is served by having the Postal Service comply with 39 U.S.C. § 5402.  To achieve a strong, healthy, and stable mail distribution system in Alaska, the RSIA defined which carriers are eligible to carry bypass mail and in which markets.  Congress determined that in order to create a stable and efficient mainline bypass mail market, the market should be limited to the existing carriers and new carriers who provide substantial passenger service on large aircraft and also satisfy other conditions.  The public interest is served by making sure that the Postal Service adheres to Congress' intent in enacting the RSIA.

## COUNT I
### (*Ultra Vires* Acts by the Postal Service)

67.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 to 66 as though fully set forth herein.

68.     Because PenAir does not satisfy the requirements of 39 U.S.C. §5402(g)(1)(A)(iv), which requires a carrier to provide scheduled service within Alaska for at least 12 consecutive months with aircraft having over 7,500 pound payload capacity, the Postal Service's determination that PenAir is eligible to receive nonpriority mainline bypass mail under 39 U.S.C. §5402(g)(5)(C) exceeds the scope of its statutory authority.

69.     The Postal Service's determination that 39 U.S.C. §5401(g)(5)(C) does not require PenAir to satisfy 39 U.S.C. §5402(g)(1)(A)(iv) is contrary to the plain language of 39 U.S.C. §5401(g)(5)(C) and therefore such determination exceeds the scope of the Postal Service's statutory authority.

70.     Alternatively, the Postal Service's determination that PenAir has satisfied 39 U.S.C. §5402(g)(1)(A)(iv) contravenes the plain language of this section and therefore exceeds the scope of the Postal Service's statutory authority.

## COUNT II
### (*Ultra Vires* Acts by the Postal Service)

71.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 to 70 as though fully set forth herein.

72.     Because PenAir provided nonpriority bypass mail service prior to January 1, 2001, it does not qualify as a "new" carrier as that term is used in 39 U.S.C. §5402(g)(5)(C). Accordingly, the Postal Service's determination that PenAir is qualified to receive equitable tender of nonpriority mainline bypass mail under 39 U.S.C. §5402(g)(5)(C) contravenes the plain

language of the definition of "new" and therefore exceeds the Postal Service's statutory authority.

73.     The Postal Service's determination that a carrier may have provided nonpriority bush bypass mail service prior to January 1, 2001 and still qualify as a "new" carrier as that term is used in 29 U.S.C. §5402(g)(5)(C) contravenes the plain language of the definition of "new" and therefore exceeds the scope of the Postal Service's statutory authority.

## <u>COUNT III</u>
### (Declaratory Judgment)

74.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 to 73 as though fully set forth herein.

75.     Because the Postal Service has determined that PenAir is eligible to receive equitable tender of nonpriority mainline bypass mail in the Anchorage-Dillingham, Anchorage-King Salmon, Anchorage-Aniak, Anchorage-McGrath, and Anchorage-Unalakleet markets in contravention of the plain language of 39 U.S.C. § 5402(g)(5)(C) and the intent of Congress in passing this provision and because Plaintiffs currently receive equitable tender of nonpriority mainline bypass mail in these five markets, there exists an actual and live controversy between Plaintiffs and Defendant Postal Service.

76.     The Postal Service's determination that PenAir did not have to satisfy 39 U.S.C. § 5402(g)(1)(A)(iv)(II) in order to be eligible to receive nonpriority mainline bypass mail under 39 U.S.C. § 5402(g)(5)(C) is an *ultra vires* act, and Plaintiffs are entitled to a declaration, pursuant to 28 U.S.C. § 2201, that such a determination contravenes 39 U.S.C. § 5402(g)(5)(C) and is therefore void.

77.     Alternatively, the Postal Service's determination that PenAir satisfied 39 U.S.C. § 5402(g)(1)(A)(iv)(II) and was therefore eligible to receive nonpriority mainline bypass mail under 39 U.S.C. § 5402(g)(5)(C) is an *ultra vires* act, and Plaintiffs are entitled to a declaration,

pursuant to 28 U.S.C. § 2201, that such a determination contravenes 39 U.S.C. § 5402(g)(5)(C) and is therefore void.

78.     The Postal Service's determination that PenAir was a "new" carrier and therefore eligible to receive nonpriority mainline bypass mail under 39 U.S.C. § 5402(g)(5)(C) is an *ultra vires* act, and Plaintiffs are entitled to a declaration, pursuant to 28 U.S.C. § 2201, that such a determination contravenes 39 U.S.C. § 5402(g)(5)(C) and is therefore void.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief against the Postal Service as follows:

(1)    For preliminary and permanent injunctive relief prohibiting the Postal Service from tendering nonpriority mainline bypass mail to PenAir under 39 U.S.C. § 5402(g)(5)(C).

(2)    For a declaration that the Postal Service's determination that PenAir is eligible for tender of nonpriority mainline bypass mail under 39 U.S.C. § 5402(g)(5)(C) contravenes the language of the provision and Congress' intent in enacting the provision and exceeds the Postal Service's authority, and is therefore void; and

(3)    For such other relief the Court deems just and proper.

Respectfully submitted,

James P. Murphy (D.C. Bar No. 380857)
jmurphy@ssd.com
Amy L. Brown (D.C. Bar No. 451090)
abrown@ssd.com
SQUIRE, SANDERS & DEMPSEY, LLP
1201 Pennsylvania Avenue, N.W.
Suite 500
Washington, D.C. 20004
Tel: (202) 626-6600
Fax: (202) 626-6780

*Attorneys for Plaintiffs Northern Air Cargo,*
*Tatonduk Outfitters Ltd. d/b/a Everts Air Cargo,*
*and Lynden Air Cargo LLC*

EXHIBIT A

LOGISTICS

 *UNITED STATES*
*POSTAL SERVICE*

August 7, 2009

Danny Seybert, President
Peninsula Airways, Inc.
6100 Boeing Avenue
Anchorage, AK 99502

Dear Mr. Seybert,

This replies to your letter of July 6 2009, as supplemented by your letter of July 22, 2009, requesting the equitable tender of non-priority mainline bypass mail as a new 121 mainline passenger carrier on the city-pair routes of Anchorage-Dillingham and Anchorage-King Salmon. Having reviewed the matter, we have concluded that your letters describe service which would make you eligible for the equitable tender you have requested in those markets.

Please file your schedules accordingly and contact Steve Deaton, Western Area DN Office (ANC), at (907) 266-3352 if you have any other questions.

Sincerely,

Tina Pruitt Campbell
Program Manager, Intra-AK Air Transportation Policy

cc:  Mr. Garcia
     Mr. Deaton
     Mr. Kilburn
     Mr. Jones
     Ms. Simpson
     File