**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORTHERN AIR CARGO, TATONDUK OUTFITTERS LTD. D/B/A EVERTS AIR CARGO, and LYNDEN AIR CARGO LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE,<br><br>Defendant.<br><br>PENINSULA AIRWAYS, INC.,<br><br>Defendant-Intervenor. | Case No.: 1:09-cv-02065 (EGS) |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States Postal Service ("USPS"), opposes respectfully the motion of Plaintiffs Northern Air Cargo, Tatonduk Outfitters Ltd d/b/a Everts Air Cargo, and Lynden Air Cargo LLC ("Plaintiffs"), for summary judgment, and cross-moves, under Federal Rule of Civil Procedure 56, for summary judgment with respect to Plaintiffs' claims, as there is no genuine issue of material fact in this case and Defendant is entitled to judgment as a matter of law. Specifically, the USPS cross-moves for summary judgment on its decision to grant equitable tender to transport mainline bypass mail in five rural markets in the State of Alaska to Defendant-Intervenor Peninsula Airways, Inc. ("PenAir") because it is supported by a reasonable interpretation of the plain meaning of 39 U.S.C. § 5402(g)(5)(c). The USPS also opposes Plaintiffs' motion for summary judgment on the ground that the USPS's interpretation of Section 5402(g)(5)(c) is utterly unreasonable and exceeds its statutory authority to regulate air carriers in Alaska's bypass mail system.

In support of this Motion, Defendant respectfully refers this Court to the accompanying Memorandum of Points and Authorities. The Declaration of Steven Deaton and corresponding exhibits, as well as Defendant's Statement of Material Facts as to Which There is no Genuine Issue, and Defendant's Opposition to Plaintiffs' Statement of Material Facts Not in Dispute, shall be filed forthwith.

Respectfully submitted,

\_/s/_____
CHANNING D. PHILLIPS, D.C. BAR #415793
Acting United States Attorney

\_\_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

\_\_/s/_____
MITCHELL P. ZEFF, D.C. BAR #494066
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 514-7352
Fax: (202) 514-8780
Email: Mitchell.Zeff@usdoj.gov

Agency Counsel:
MICHELLE A. WINDMUELLER
D.C. BAR # 470145
Senior Litigation Counsel
United States Postal Service
475 L'Enfant Plaza SW, Room 6117
Washington, DC 20260

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORTHERN AIR CARGO, TATONDUK OUTFITTERS LTD. D/B/A EVERTS AIR CARGO, and LYNDEN AIR CARGO LLC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES POSTAL SERVICE, <br><br> Defendant. <br><br> PENINSULA AIRWAYS, INC., <br><br> Defendant-Intervenor. | ) ) ) ) ) ) ) ) Case No.: 1:09-cv-02065 (EGS) ) ) ) ) ) ) ) ) ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

This lawsuit challenges a determination by the United States Postal Service ("USPS") to grant equitable tender, pursuant to 39 U.S.C § 5402 (g)(5)(c), to Peninsula Airways, Inc. ("PenAir") to deliver mainline bypass mail to five isolated communities in the State of Alaska that currently receive no mainline passenger service. Plaintiffs attempt to circumvent 39 U.S.C § 410 (a), which exempts the USPS from judicial review of Administrative Procedures Act ("APA") claims against it. Plaintiffs instead allege that the USPS exceeded the statutory authority granted explicitly to it by the United States Congress to regulate the delivery of bypass mail in the State of Alaska by granting equitable tender to PenAir to deliver mainline bypass mail. As explained herein, however, the USPS acted entirely within its statutory authority and thus this Court lacks subject matter jurisdiction over the case.

Even if the Court were to find that the USPS's decision was subject to judicial review, the USPS's construction of the statute it is charged with enforcing is a reasonable interpretation that is entitled to deference in light of the plain language and purpose of the Rural Service Improvement Act of 2002 (hereinafter, "RSIA").  The USPS's interpretation allows an otherwise qualified carrier to deliver mainline bypass mail and provide mainline passenger service on routes where no existing mainline passenger carrier is providing service to rural Alaskans, thus effectuating the purposes of the statute.  Plaintiffs' interpretation of the RSIA, on the other hand, would turn the RSIA on its head and lead to absurd results.  For these reasons, Defendant asks respectfully that the Court DENY Plaintiffs' motion for summary judgment and GRANT Defendant's cross-motion for summary judgment.

## BACKGROUND

The United States Congress ("Congress"), pursuant to 39 U.S.C. § 5401 (a) and (b), authorizes the USPS to provide for the safe and expeditious transportation of mail by aircraft and to make rules, regulations and orders as may be necessary for such transportation.  Congress recognizes that the USPS's regulation of air transportation is necessary especially in the State of Alaska because Alaska is the largest State in the Union in terms of landmass and because a large portion of the population within Alaska can only be reached via air transportation.  *See* Public Law 107-206, Section 3002(a), (b), attached as Exhibit B to Declaration of Steven Deaton.  Therefore, Congress enacted the Rural Service Improvement Act of 2002 ("RSIA"), codified at 39 U.S.C. § 5402, in order to ensure reliable and affordable passenger and mail service to rural Alaskans.

The USPS defines bypass mail as: "Standard mail that is prepared by an authorized

bypass mail shipper which bypasses postal processing. It is tendered directly to an intra-Alaska air carrier for delivery directly to the addressee under prescribed guidelines and conditions." *See* Declaration of Steven Deaton, Exhibit D. In order for an air carrier to become eligible to participate in Alaska's bypass mail program, it must hold a certificate of public convenience and necessity issued by the United States Department of Transportation pursuant to 49 U.S.C. § 41102(a) and (b). *Id.* at ¶ 9. It must also demonstrate that it operated and adhered to a minimum level of scheduled service between any two points within the state of Alaska for at least twelve consecutive months.

There are two types of eligible bypass mail carriers in Alaska's system and two corresponding types of mail rates available to those carriers: (1) the higher bush rate mail "is distinguished by the size of the aircraft used to transport it – aircraft having a payload capacity up to and including 7,500 pounds," and (2) mainline rate mail is also "distinguished by the size of the aircraft used to transport it – aircraft having a payload capacity over 7,500 pounds." Declaration of Steven Deaton, Exhibit D.

Prior to August 22, 2009, PenAir operated as one of the largest "bush" carriers in the State of Alaska, with a fleet of aircraft with payload capacity under 7,500 lbs that includes a 30-seat Saab 340 passenger aircraft several smaller aircraft. After receiving the USPS's determination, PenAir began utilizing aircraft with a payload capacity over 7,500 lbs. *See* Declaration of Daniel Seybert ¶¶ 8, 10, 15, attached as Exhibit F to Declaration of Steven Deaton.[1]

---

[1] PenAir began scheduled passenger operations in Alaska more than 50 years ago, making it one of the oldest airlines in the State. *See* Declaration of Daniel Seybert ¶ 5, attached
(continued...)

On July 6, 2009, PenAir submitted a letter to Tina Pruitt Campbell--Program Manager, Intra-Alaska Air Transportation Policy, Commercial Air Operations, USPS Logistics, at USPS Headquarters in Washington, D.C.--requesting an equitable tender pursuant to 39 U.S.C. § 5402(g)(5)(c) of nonpriority mainline bypass mail on the Anchorage-Dillingham and Anchorage-King Salmon routes.

Section 5402(g)(5)(c) states that: "Notwithstanding subparagraph (A) and paragraph 1(B), a new 121 mainline passenger carrier, otherwise qualified under this subsection, may immediately receive equitable tender of nonpriority mainline bypass mail to a hub point in the State of Alaska if the carrier meets the requirements of subparagraphs (A), (c), and (D) of paragraph (1) and subsection (h)(2)(B) and . . . no 121 mainline passenger carrier serves the city pair route." *See* Declaration of Steven Deaton, Exhibit E.

Section 5402(g)(5)(c) was designed to allow otherwise qualified air carriers to begin immediately providing mail and passenger service to communities in which no other mainline passenger service is available, without having to abide by the 12 consecutive month mainline rate service or the 6 month passenger service requirement of subparagraph (A). Declaration of Steven Deaton ¶ 14.

On July 22, 2009, PenAir supplemented its request for equitable tender to clarify that it intended to operate mainline passenger aircraft as well as mainline all cargo aircraft on these two routes. It also advised the USPS that it intended to reconfigure two of its Saab 340 passenger aircraft, which had been qualified previously to provide bush mail, to qualify as mainline aircraft

---

[1]/(...continued)
as Exhibit F to Declaration of Steven Deaton.

with greater than 7,500 pounds of capacity and that it intended to acquire additional mainline Saab 340 aircraft in an all-cargo configuration. *See* Declaration of Daniel Seybert ¶ 17, attached as Exhibit F to Declaration of Steven Deaton.

On August 7, 2009, the USPS responded to PenAir's letters as follows: "Having reviewed the matter, we have concluded that your letters describe service which would make you eligible for the equitable tender you requested in those markets." Declaration of Steven Deaton, Exhibit I.

On August 24, 2009, PenAir submitted another letter to the USPS requesting the equitable tender of nonpriority mainline bypass mail on three additional routes: Anchorage-McGrath, Anchorage-Unalakleet, and Anchorage-Aniak. At the time when PenAir submitted its August 24th letter, no mainline passenger carrier operated on the Anchorage-McGrath, Anchorage-Unalakleet, and Anchorage-Aniak routes. *See* Declaration of Daniel Seybert ¶ 22, attached as Exhibit F to Declaration of Steven Deaton.

On September 2, 2009, the USPS concluded that PenAir was eligible for equitable tender on these three additional routes, as well. Declaration of Steven Deaton, Exhibit K.

The five communities on the routes on which PenAir requested equitable tender (Anchorage-Dillingham, Anchorage-King Salmon, Anchorage-McGrath, Anchorage-Unalakleet, and Anchorage-Aniak) are isolated and only accessible regularly throughout the year by air. *See* Declaration of Daniel Seybert ¶ 22, attached as Exhibit F to Declaration of Steven Deaton.

PenAir will not have any material impact on mainline mail rates on these routes given the small amount of revenue ton miles (one ton of revenue traffic, passenger and/or cargo, transported one mile, hereinafter "RTM" ) that PenAir is projected to carry (about 1.8%) on these five routes. *Id.*

The USPS does not anticipate that PenAir's reconfiguration of its passenger aircraft from 30 to 19 seats will have any material impact on its ability to meet the demand for passenger service on these five routes.  *Id.* at ¶ 32.

## STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.  *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party.  *Matsushita*, 475 U.S. at 587.  The factual dispute must be capable of affecting the substantive outcome of the case and be supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party.  *Anderson*, 477 U.S. at 247-48; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Id*. (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

## ARGUMENT

**A.    39 U.S.C § 410 (a) bars judicial review of Plaintiffs' claims.**

Plaintiffs' Complaint asserts that this Court has subject matter jurisdiction over this

action under 28 U.S.C § 1339 (district courts have original jurisdiction over any civil action arising under any Act of Congress relating to the Postal Service) and 39 U.S.C § 409(a) (district courts have original but not exclusive jurisdiction over all actions, except appeals of postal ratemaking, brought by or against the Postal Service).  Compl. ¶ 5.  However, as explained below, the mere fact that the Postal Service can sue and be sued in this Court does not confer this Court with subject-matter jurisdiction over any particular case; after all, when Congress reorganized the Postal Service in 1970, it exempted most Postal Service actions – including ones such as this, where the Postal Service acted entirely within the scope of its statutory authority, from judicial review.

Section 410 (a) of the Postal Reorganization Act ("PRA"), codified at 39 U.S.C. § 410 (a), states:  "[N]o federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service."  Chapters 5 and 7 of title 5 constitute the APA, which governs judicial review of actions taken by federal administrative agencies.  The 1970 PRA explicitly exempts the Postal Service from those statutory provisions except in very limited situations.  *See Nat'l Easter Seal Soct'y v. United States Postal Service*, 656 F.2d 754, 766-67 (D.C. Cir. 1981) (holding that the Postal Service does not have to comply with the rulemaking procedures required by the APA).

The narrow exception to the USPS exemption under 39 U.S.C. § 410 (a) is where the USPS has taken an action that exceeds its statutory authority.  *See Dart v. United States*, 848 F.2d 217, 221-22 (D.C. Cir. 1988) ("Judicial review is favored when an agency is charged with acting beyond its authority . . . . The . . . test for whether an agency has acted 'in excess of its delegated powers' has been alternatively phrased as whether the agency action 'on its face'

7

violated a statute."). "Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction." *Id.* (citing *Leedom v. Kyne*, 358 U.S. 184 (1958); see also *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp.2d 76 (D.D.C. 2006) (This nonstatutory [*ultra vires*] exception is intended to be of extremely limited scope . . . . The D.C. Circuit has explained that nonstatutory review may be had only when the agency's error is patently a misconstruction of [a statute], or when the agency has disregarded a specific and unambiguous statutory directive, or when the agency has violated some specific command of a statute") (citations omitted). Relatedly, an agency is entitled to *Chevron* deference when it interprets a statute it is charged with carrying out, but is not entitled to deference, and non-statutory judicial review is appropriate, when the agency interprets the statute in a manner that exceeds its statutory authority and is therefore unreasonable. *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837 (1984) (holding the court must give effect to the unambiguously expressed intent of Congress but if a statute is silent or ambiguous on the precise question at issue the court must determine whether agency's interpretation of the statute is "permissible" or "reasonable"); *see also Animal Defense Legal Fund, Inc. v. Glickman*, 204 F.3d 229, 234 (D.C. Cir. 2000) ("We have distinguished between *Chevron* review and *State Farm* arbitrary and capricious review . . . but the two issues overlap at the margins") (citations omitted).

It follows that in order to maintain this lawsuit, Plaintiffs must establish a basis for subject matter jurisdiction in this Court independent of the APA – more specifically, they must establish that the USPS's act of interpreting the RSIA and agreeing to equitable tender to PenAir exceeded the USPS's statutory authority to regulate the intra-Alaska bypass mail system. The

cases Plaintiffs rely primarily on in support of that *ultra vires* argument, however, are readily distinguishable: in those cases, the courts held that judicial review was appropriate because an agency promulgated regulations that directly contradicted the plain language of the statute, whereas, in the instant case, Plaintiffs merely disagree with the USPS's interpretation of unclear language.

*Aid Ass'n for Lutherans v. United States Postal Service*, 321 F.3d 1166 (D.C. Cir. 2003), for example, concerned USPS's application of its authority under the PRA to prohibit non-profit entities from paying the lower non-profit postage rate if the entity's mailing was designed to promote insurance policies that provide coverage that is generally otherwise commercially available. The plaintiffs, two non-profit entities, argued that the USPS exceeded its authority under the PRA when it promulgated a regulation that extended the prohibition to a non-profit's promotion of any "type of insurance" generally otherwise available (regardless of the coverage provided in the particular insurance policy), thereby effecting a "blanket exclusion of nonprofits from the use of the reduced mail permit for insurance-related purposes." *Id.* at 177-78. Similarly, in *Jasperson*, 460 F. Supp.2d at 76, the BOP promulgated regulations that directly contradicted the plain language of 18 U.S.C § 3621. That statute obligated the BOP to consider a list of *individualized* circumstances in determining whether to house inmates in community confinement centers ("CCCs") instead of the general prison population. *Id.* at 89-90. Nonetheless, the BOP promulgated subsequently a regulation that *across the board* allowed CCC confinement only during the last ten percent of a prison term, and not to exceed six months. The Court ruled that judicial review of the BOP's regulation was proper because it contradicted directly the plain language of the statute prohibiting non-individualized analysis and the BOP, therefore, exceeded its authority in promulgating it. *Id.*

9

Here, Plaintiffs are not arguing that the USPS *lacks* the authority to grant equitable tender to an airline under 39 U.S.C. § 5402 (g)(5)(c) or that it passed a regulation that directly contradicts the plain meaning of the statute. Rather, Plaintiffs are challenging the USPS's *interpretation* of the eligibility requirements of § 5402 (g)(5)(c) as applied to PenAir. Pls.' Mot. for SJ at pp. 9-25. Therefore, 39 U.S.C. § 410 (a) bars judicial review of Plaintiffs' claim.[2]

**B.    The USPS's decision to grant equitable tender to PenAir was based on a reasonable interpretation of Section (g)(5)(c)**

Even if the Court were to find that judicial review of the USPS's decision to grant equitable tender to PenAir was appropriate in this case, however, the USPS's interpretation of § 5402 (g)(5)(c) is entitled to deference and must only be overturned if found to be utterly unreasonable. *Chevron U.S.A., Inc.*, 467 U.S. at 844 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.").[3]

---

[2] In *Cort v. Ash*, 422 U.S. 66, 78 (1975), the Supreme Court held that several factors inform the determination of whether a private right of action is implicit in a statute, including (1) whether the statute was enacted to benefit the plaintiff; (2) whether there is evidence of legislative intent to create or deny such a right, explicitly or implicitly; (3) whether implying such a right is consistent with the overall purpose of the legislation; and (4) whether the cause of action is one traditionally relegated to state law. An analysis of these factors demonstrates that Congress did not intend to create a private right of action against the USPS under 39 U.S.C. § 5402. The RSIA was enacted to benefit rural Alaskans, not Plaintiffs; there is no evidence of legislative intent to create a right of private action based on the USPS's grant of equitable tender to another entity; and implying such a right is not consistent with the overall purpose of the legislation. *See Tax Analysts v. IRS*, 214 F.3d 179, 185-86 (D.C. Cir. 2000) (according greater weight to the first three factors of the analysis).

[3] The USPS does not believe the first step of the *Chevron* analysis applies to this case because the meaning of 39 U.S.C. § 5402 (g)(5)(c) is not clear and unambiguous. Indeed,
(continued...)

The USPS granted properly equitable tender to PenAir because PenAir satisfies the eligibility requirements of Section 5402 (g)(5)(c).  Section 5402(g)(5)(c) states that: "Notwithstanding subparagraph (A) and paragraph 1(B), a new 121 mainline passenger carrier, otherwise qualified under this subsection, may immediately receive equitable tender of nonpriority mainline bypass mail to a hub point in the State of Alaska if the carrier meets the requirements of subparagraphs (A), (c), and (D) of paragraph (1) and subsection (h)(2)(B) and . . . no 121 passenger carrier serves the city pair route."

There is no dispute that PenAir has satisfied the requirements of § 5402 (g)(1)(c) because the USPS has not established a larger number of flights or greater number of days of service in the five markets for which PenAir sought equitable tender and the USPS expects that PenAir's Saab 340 aircraft will be capable of addressing any such service requirement the USPS does establish.  *See* Declaration of Daniel Seybert ¶ 32, attached as Exhibit F to Declaration of Steven

---

[3]/(...continued)
Plaintiffs' contention that the USPS's interpretation of 39 U.S.C. § 5402 (g)(5)(c) is not entitled to *any deference* under the first step of the *Chevron* inquiry is belied by their own attempt to interpret § 5402 (g)(5)(c), and by the legislative history of the RSIA.  Moreover, in their attempt to clear the jurisdictional hurdle here, Plaintiffs must argue that the USPS's action has the force of law to exceed the USPS's statutory authority.  Plaintiffs argue later in their brief, however, that the USPS's action does not have the force of law under *Christensen* v. *Harris County*, 529 U.S. 576 (2000).  Obviously Plaintiffs cannot have it both ways.  And in any event, Plaintiffs ignore settled law in this Circuit stating that: "[n]either the Supreme Court nor [the D.C. Circuit] has read *Christensen* to have limited *Chevron* deference to rulemakings and formal adjudications only, much less to preclude *Chevron* deference to situations involving application of an agency's delegated authority to particular facts."  *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 466 (D.C. Cir. 2007).
Therefore, the analysis of the USPS's interpretation of § 5402 (g)(5)(c) must take place under the second prong of *Chevron*, where the Court must determine whether the USPS's decision to grant equitable tender to PenAir was based on a "reasonable" interpretation of the RSIA.  To the extent that the first step of the *Chevron* analysis applies, the plain meaning of § 5402(g)(5)(c) supports the USPS's decision to grant PenAir's request for equitable tender to carry mainline bypass mail on the five routes at issue.

11

Deaton.

Although the carrier seeking equitable tender must meet the requirements of § 5402 (g)(1)(D), there is no such section in the current version of the RSIA and, therefore, there is no requirement under this subparagraph for PenAir to satisfy. Plaintiffs purport to find "confirmation" for their interpretation by citing a version of the RSIA that is no longer in force and has long since been amended. (Pls.' Mot. at 17-18). But nothing in that now-defunct version supports their view. To begin with, statutes that once existed but have since been amended are no basis upon which to overturn agency action. Moreover, the fact that Plaintiffs must retreat to old provisions to bolster their interpretation of existing statutory provisions only undermines their insistence that the statute is "unambiguous" and should be resolved under step one of *Chevron*. But in any event, the 2002 statute does nothing to support Plaintiffs' theory because it, too, suffers from the same ambiguity that exists in the current version. Under the 2002 statute, Section (g)(5)(c) required a new carrier to comply generally with the requirements set forth in (g)(1)(D), but the "notwithstanding" introductory clause still exempted a new carrier from the twelve month requirement, which was then set forth in (g)(1)(D)(ii). Although parts of the 2002 statute contained different numbering, Section (g)(5)(c) created the same end result as today's version—a new carrier was exempt from the twelve month requirement. Thus, Plaintiffs accomplish nothing by citing the 2002 statute except the unintended consequence of undermining their own *Chevron* step one argument.

Section (g)(1)(h)(2)(B) requires a carrier to "operate aircraft certificated to carry at least 19 passengers" to "remain eligible for equitable tender under this subsection." PenAir's Saab 340 aircraft has been certificated to carry at least 19 passengers and, therefore, satisfies this

requirement.  *See* Declaration of Daniel Seybert ¶ 32, attached as Exhibit F to Declaration of Steven Deaton.

The only remaining issue is whether § 5402 (g)(1)(A) has been satisfied.  Section (g)(1)(A) requires a carrier to: (I) hold a certificate of public convenience and necessity issued under section 41102 (a) of title 49 by the Department of Transportation, (ii) operate a certain number of scheduled flights each week, (iii) exhibit an adherence to these scheduled flights, and (iv) have provided service "for at least 12 consecutive months with aircraft . . . (II) over 7,500 pounds payload capacity before being selected as a carrier of nonpriority bypass mail at the intra-Alaska mainline service mail rate."  There is no dispute that PenAir satisfies subparts (I) through (iii) of section (g)(1)(A).  The dispute, instead, concerns whether PenAir was required to meet the requirements of § 5402 (g)(1)(A)(iv)(II).  Although, by virtue of § 5402(g)(5)(c), new mainline passenger carriers must meet the requirements of § 5402(g)(1)(A), they need not meet the requirement of this subpart.  The reason for that lies in the "[n]otwihstanding" language in the lead-in clause to § 5402(g)(5)(c) – which allows equitable tender if all other qualifications are met, "[n]otwithstanding the requirements" of § 5402(g)(5)(A).

Section 5402 (g)(5)(A) states explicitly that (but for any notwithstanding language), equitable tender shall be offered "to a new 121 mainline passenger carrier entering a mainline route in the State of Alaska, if the carrier" meets two requirements: a requirement that it "has provided at least 75 percent of the number of insured passenger seats as the number of available passenger seats being provided by the mainline passenger carrier providing the greatest number of available passenger seats on that route for the 6 months immediately preceding the date on which the carrier seeks tender of such mail" and the "the requirements of subsection (g)(1)(A)(iv)(II)."  The first of those two conditions will necessarily not apply to a section

13

5402(g)(5)(c) situation such as this one because 5402(g)(5)(c) only applies if no other mainline *passenger* carriers are operating in the market. Accordingly, if this "notwithstanding" clause is to have any meaning, it must be that carriers can enter the market regardless of whether they meet "the requirements of subsection (g)(1)(A)(iv)(II)" – or, at the very least, it is reasonable to interpret it as having that meaning.

It makes sense that a carrier seeking to "immediately" deliver mainline bypass mail and provide mainline passenger service on a route where *no existing mainline passenger carrier is operating* would not have to abide by the twelve month capacity requirement of Section (g)(1)(A)(iv)(II) or the six month passenger service requirement of Section (g)(5)(A)(ii). The stated goal of the RSIA is to provide mail and passenger service to isolated communities that are only reachable via air transportation. If an otherwise qualified carrier, that is, a carrier that has been certificated by the Department of Transportation to carry bypass mail and meets the other requirements of Section (g)(1)(A), is prepared to enter the mainline market where no other mainline passenger carrier is operating, the carrier "may immediately receive equitable tender of nonpriority mainline bypass mail" to meet the needs of rural Alaskans for mail and passenger service. This is precisely the situation here.

The USPS's interpretation of Section (g)(5)(c) is reasonable because it gives effect to all of the applicable RSIA provisions. For instance, Plaintiffs contend that PenAir fails to satisfy the "new" requirement of Section (g)(5)(c) because it has been providing bypass mail service since before January 1, 2001. Pls.' Mot. For SJ at pp. 19-21. Section 5402 (a)(15) defines a "new" carrier as one who "began providing nonpriority bypass mail service on a city pair route in the State of Alaska after January 1, 2001." The word "new," however, is an adjective that must be read to modify the noun to which it refers. WEBSTER'S II NEW RIVERSIDE

UNIVERSITY DICTIONARY 792 (1994); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1067 (D.C. Cir. 1998) (holding that agency must give effect to whole statute).  In Section 5402 (a)(13), for example, no reference is made to bush or mainline mail.  The definition refers only generally to "nonpriority bypass mail service."  Therefore, one must look to the noun "new" is modifying in Section (g)(5)(c) in order to understand its meaning.  Section (g)(5)(c), refers to "new 121 mainline passenger carriers" seeking equitable tender to deliver mainline mail on routes where no existing mainline passenger carrier is providing service.  Therefore, PenAir must qualify as a "new mainline passenger carrier" in order to receive equitable tender for mainline bypass mail under Section (g)(5)(c) .  There is no dispute that PenAir began providing mainline mail and passenger service after January 1, 2001.  In fact, it has only been providing mainline bypass mail and passenger service since November 9, 2009.  Declaration of Daniel Seybert ¶ 15, attached as Exhibit F to Declaration of Steven Deaton.  Therefore, the USPS's determination that PenAir was entitled to receive equitable tender to deliver mainline bypass mail on five routes where no mainline passenger service existed, is patently reasonable.

To adopt Plaintiffs' interpretation of Section (g)(5)(c), on the other hand, would turn the RSIA on its head and lead to an absurd result.  *Mova Pharm. Corp.,* 140 F.3d at 1068 ("In deciding whether a result is absurd, we consider not only whether that result is contrary to common sense, but also whether it is inconsistent with the clear intentions of the statute's drafters-that is, whether the result is absurd when considered in the particular statutory context.").  If the Court were to revoke the USPS's grant of equitable tender to PenAir, it would leave Alaskans on those routes without *any mainline passenger service*, since the only mainline carriers currently serving the five routes at issue are cargo-only carriers, with the exception of

Alaska Airlines, which provides passenger service on two routes for only a few weeks during the summer.

Furthermore, if, as Plaintiffs suggest, the "Notwithstanding subparagraph (A)" clause of Section (g)(5)(c) only exempted an otherwise qualified carrier seeking equitable tender on routes with no existing mainline passenger service from the six month waiting period of (5)(A)(ii), but not the twelve month waiting period of (5)(A)(I) and (g)(1)(A)(iv)(II), it would prohibit any mainline passenger carriers from "immediately" stepping in to provide mainline bypass mail and passenger service to communities where *no mainline passenger carrier is currently operating*. The only way to give effect to Section(g)(5)(c), therefore, is to exclude *all* of the requirements of (g)(5)(A), including the twelve month payload capacity requirements of (g)(1)(A)(iv)(II). This is what the USPS's interpretation of Section(g)(5)(c) does, and what Plaintiffs' interpretation fails to do. The USPS's decision to grant PenAir equitable tender immediately was reasonable and should be upheld.

## **CONCLUSION**

For all these reasons, the Court should GRANT Defendant's motion for summary judgment, DENY Plaintiffs' motion for summary judgment, and DISMISS the case, with prejudice.

Respectfully submitted,

_/s/_____
CHANNING D. PHILLIPS, D.C. BAR #415793
Acting United States Attorney

__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

__/s/_____
MITCHELL P. ZEFF, D.C. BAR #494066
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7352
Fax: (202) 514-8780
Email: Mitchell.Zeff@usdoj.gov

Of Counsel

MICHELLE A. WINDMUELLER
Senior Litigation Counsel
United States Postal Service
475 L'Enfant Plaza, SW Room 6117
Washington, D.C. 20260
Phone: (202) 268-2064
Fax: (202) 268-6279
Email: Michelle.A.Windmueller@usps.gov