**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORTHERN AIR CARGO, TATONDUK ) <br> OUTFITTERS LTD. D/B/A EVERTS AIR ) <br> CARGO, and LYNDEN AIR CARGO LLC, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES POSTAL SERVICE, ) <br> ) <br> Defendant. ) <br> ) <br> PENINSULA AIRWAYS, INC., ) <br> ) <br> Defendant-Intervenor. ) <br> ) | Case No.: 1:09-cv-02065 (EGS) |

**DEFENDANT'S SUPPLEMENTAL BRIEF**

Defendant, the United States Postal Service ("USPS"), by and through undersigned counsel, hereby submits its Supplemental Brief to address three questions raised by the Court at the February 23, 2010 motions hearing: 1) why did Congress enact the Rural Service Improvement Act of 2002 ("RSIA")? 2) why does PenAir qualify as a "new" 121 mainline passenger carrier? and 3) why is the USPS's interpretation of 39 U.S.C. §5402(g)(5)(C) entitled to deference?

**I.   Congress Enacted the RSIA to Incentivize Carriers to Provide Non-Mail Freight and Passenger Service to Rural Alaskans, Not to Maintain the Status Quo of Bush and Mainline Carriers.**

In the years leading up to the passage of the RSIA, bush carriers that *only carried mail* without providing any passenger or non-mail freight service to Alaskans were flooding the market to the detriment of full service (passengers, freight and mail) carriers and rural Alaskans. As Plaintiffs' counsel conceded in response to a question from the Court about the purpose of the

RSIA, "bush carriers were coming into the mainline markets and carrying mainline bypass mail without carrying passengers or providing non-mail freight service." Hrg. Tr. at 41, lns 2-6.[1] The proliferation of mail-only bush carriers in the mainline bypass mail market is precisely the problem Congress attempted to address through the passage of the RSIA.

Later in the motions hearing, however, Plaintiffs' counsel argued that Congress enacted the RSIA to maintain the status quo of mainline and bush carriers by permanently excluding bush carriers from mainline markets and mainline carriers from bush markets. *See* Hrg. Tr at 44, lns 20-25; 45, lns 1-6, 13-22.[2] Nowhere can Plaintiffs find support for this argument. In fact, the plain language of the RSIA establishes that Congress had no intention of permanently excluding bush carriers from mainline markets, and vice versa. Subsection (g)(2)(C), for example, states that:

> The Postal Service shall offer a bush passenger carrier providing service on a route in

---

[1] *See also* Hrg. Tr. at 5, lns 6-10: (Court): "What's the reason for the bush bypass mail system? There's a reason for that. What's the reason for it? (Government Counsel): The reason for it is to provide mail, non-mail freight and passenger service to rural Alaskans."

[2] (Court): "A permanent ban? Is that what Congress intended, a permanent ban on a certain industry of bush pilots? I mean, if you're correct, then Congress intended that no one providing bush service would ever qualify for an equitable tender for mainline distribution; is that right?" (Plaintiffs' Counsel): "Yes. In terms of what Congress intended, it intended to maintain the status quo in terms of carriers of bypass mail. If you provided mainline bypass mail service prior to January 1st, 2001, you wouldn't qualify to be a new bush carrier. Likewise, if you provided bypass mail service as a bush carrier prior to January 1st, 2001, you couldn't qualify to be a new mainline carrier . . . . But here, there's logic to this decision by Congress because it's trying to maintain stability. And in order to do that, it recognized we have to have healthy mainline carriers and we have to have healthy bush carriers. And so what Congress did was it said, 'We're going to maintain the status quo. If you carry bypass mail prior to January 1st, 2001, as a mainline carrier, you remain a mainline carrier.' It doesn't make sense for all the mainline carriers to jump ship and become new bush carriers and vice versa, so there is logic in the sense of trying to ensure stability."

> the State of Alaska between an acceptance point and a hub not served by a mainline carrier the opportunity to receive equitable tender of nonpriority bypass mail at mainline service rates when a mainline carrier begins serving that route if the bush passenger carrier– (i) meets the requirements of paragraph (1); (ii) provided at least 20 percent of the passenger service (as calculated in subsection (h)(5)) between such city pair for the 6 months immediately preceding the date on which the bush carrier seeks such tender; and (iii) continues to provide not less than 20 percent of the passenger service on the city pair route while seeking such tender.

*See also* 39 U.S.C. § 5402(g)(2)(D) ("The Postal Service shall offer bush passenger carriers and nonmail freight carriers the opportunity to receive equitable tender of nonpriority bypass mail at mainline service rates from a hub point to a destination city in the State of Alaska if the city pair is also being served by a mainline carrier . . . ."). These provisions demonstrate that the RSIA contemplated bush carriers delivering mainline bypass mail even on routes where existing mainline passenger carriers were operating (which is not the situation at issue here) as long as they meet certain passenger service and cargo capacity requirements. Although mainline carriers do not typically attempt to enter bush markets because their equipment is not well suited to the short runways and difficult terrain in which bush carriers operate, there are no additional restrictions in the RSIA on mainline carriers who wish to enter a market where bush carriers are operating. And, in fact, one of the Plaintiffs, Tatonduk Outfitters Ltd. d/b/a Everts Air Cargo, did just that.

The purpose of the RSIA, therefore, was to protect carriers providing passenger and non-mail freight service as well as mail delivery to rural Alaskans from mail-only carriers entering the market for the sole purpose of obtaining bypass mail revenues. That is why the RSIA includes cargo capacity and passenger service requirements for new entrants. *See* Section 5402(a)(15)(A) ("the term 'new,' when referencing a carrier, means a carrier that meets the respective requirements of subclause (I) [payload capacity of up to 7,500 pounds] or (II) [payload

capacity of at least 7,500 pounds] of subsection (g)(1)(A)(iv), depending on the route being served and the size of aircraft being used to provide service"). Plaintiffs' contention to the contrary is particularly startling in light of the fact that Plaintiff Tatonduk Outfitters Ltd. d/b/a Everts Air Cargo currently operates as both a mainline carrier and a bush carrier within Alaska's bypass mail system.

## II.     PenAir is a "New" Mainline Passenger Carrier in the Five Markets at Issue Under the Plain Language of Sections (a)(15) and (g)(5)(C).

At the motions hearing, Plaintiffs' counsel argued that the definitional section of the RSIA is determinative of whether PenAir can qualify as a new 121 mainline passenger carrier on the five routes at issue, where no mainline passenger carrier is currently providing *any* regular passenger service.[3]  Hrg. Tr. at 47, lns 8-23 ("If you note above in (15)(A), Congress set forth the requirement that a new carrier would have to satisfy based on whether the carrier was trying to become a mainline carrier or a bush carrier, but it didn't include similar qualifications in (15)(B). Rather, it very plainly said if you provided bypass mail service prior to January 1st, 2001, you do not qualify as a new entrant . . . the whole point is that when you get to a provision like (g)(5)(C) and you see the word 'new,' there is meaning to that word. Congress didn't just want it to be the common and ordinary understanding of 'new.'"). Plaintiffs' argument fails for at least two reasons.

First, Subsection (a)(15)(B) does not preclude a carrier from qualifying as "new" if it

---

[3] In footnote 6 of Plaintiffs' Supplemental Brief, Plaintiffs again contend that Alaska Airlines is providing passenger service "in some or all of these markets . . . on a seasonal basis." Alaska Airlines provides mainline passenger service on only two of the five routes at issue, for only ten weeks during the summer. Deaton Decl. ¶ 16. At the time PenAir sought to enter the market as a mainline carrier with respect to those routes, no mainline carrier was offering passenger service to any route at issue.

began providing service on *any* city pair route (mainline or bush) in the state of Alaska before January 1, 2001. Rather, it applies to carriers who "began providing nonpriority bypass mail service on *a* city pair route in the State of Alaska after January 1, 2001." (Emphasis added.) By its own terms, therefore, the word "new" must be read in context with the type of aircraft (mainline or bush) that applies. If a carrier began providing mainline passenger service on a city pair route after January 1, 2001, as PenAir did on the five routes at issue, it would be considered a new mainline passenger carrier.

Moreover, the plain language of Section (g)(5)(C) supports the USPS's reading of the definitional section on which Plaintiffs so fervently rely. *See* Hrg. Tr. at 70, lns 6-15 ("Our answer is that it is the plain language. I think, as we put forth in all of our briefing, that we don't believe the Court ever gets beyond *Chevron* Step One because in both with – both with respect to the notwithstanding argument and the new argument, the language is plain. In fact, on the new argument, neither the Postal Service or PenAir has never even argued that it's in any way ambiguous. They just say it's an adjective and so you have to give it this meaning, but they don't point to any language and say, 'This is ambiguous.'"). Section (g)(5)(C) states explicitly that "a new 121 mainline passenger carrier, otherwise qualified under this subsection, may immediately receive equitable tender of nonpriority mainline bypass mail . . . ." Although the "Notwithstanding" lead-in clause renders Section (g)(5)(C) ambiguous with respect to the "otherwise qualified under this subsection" language, the plain language of Section (g)(5)(C) unambiguously supports the USPS's determination that PenAir qualifies as a "new 121 mainline passenger carrier" because it did not begin providing mainline passenger service on the five

routes at issue until after January 1, 2001.[4]

### III.    The USPS's Letters Granting Equitable Tender to PenAir Under Section (g)(5)(C) Carried the Force of Law and Represented a Reasonable Interpretation of the RSIA that is Entitled to Deference.

#### A.    The USPS's Decisional Letters are Entitled to *Chevron* Deference Because they Carried the Force of Law.

The procedural history of this case demonstrates that the USPS's letters granting PenAir equitable tender to deliver mainline bypass mail carried the force of law. As Plaintiffs' counsel conceded at the motions hearing, whether the USPS's letters carried the "force of law" that warrants *Chevron* deference from the Court depends on whether the decision to grant PenAir equitable tender to deliver mainline bypass mail on the five routes at issue was "so informal that no one's even paying attention to it." Hrg. Tr. at 65, lns 5-10; *See also Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004) (applying *Chevron* deference to FDA's letter decisions). On August 7, 2009, the USPS granted PenAir equitable tender to deliver mainline bypass mail on two of the five routes at issue: Anchorage-Dillingham and Anchorage-King Salmon. After considering the comments of Alaska Airlines, which raised essentially the same

---

[4] Plaintiffs' reliance on *Alaska Central Express, Inc. v. United States*, 145 Fed. Appx. 211 (9th Cir. 2005) for the proposition that a court has upheld the constitutionality of a permanent ban on bush carriers retrofitting their planes to enter mainline markets is misplaced. In *Alaska Central,* a bush carrier, operating bush equipment, sought to continue receiving mainline bypass mail on mainline routes just as it had been before the passage of the RSIA without meeting the RSIA's cargo capacity requirements for entry into a mainline market. In other words, *Alaska Central Express* challenged the constitutionality of the RSIA precluding a bush carrier from receiving the mainline rate in a mainline market using *bush equipment*. PenAir, on the other hand, received equitable tender to deliver mainline bypass mail, on a mainline route, with *mainline equipment. Alaska Central* did not address the RSIA's application of the "new" carrier definition or its constitutionality. By choosing USPS's explanation of "new" in this context, the Court can avoid having to rule on the constitutionality of the interpretation that Plaintiffs urge the Court to adopt.

objections offered by Plaintiffs here, the USPS also concluded on September 2, 2009 that PenAir was eligible to receive mainline bypass mail on three additional routes: Anchorage-McGrath, Anchorage-Unalakleet, and Anchorage-Aniak.  Unhappy with the USPS's decision to grant PenAir equitable tender to deliver mainline bypass mail on these five routes, Plaintiffs filed a motion for preliminary injunction on November 3, 2009, which Plaintiffs subsequently converted at the Court's request to a motion for summary judgment.  Since November 9, 2009, PenAir has been providing mainline bypass mail and passenger service on all five routes at issue.  Given this procedural history and the current posture of this case, it can hardly be argued that the USPS's letter decision to grant equitable tender to PenAir on the five routes at issue pursuant to Section (g)(5)(C) of the RSIA had no binding legal effect.  The USPS's interpretation of the RSIA, therefore, is entitled to *Chevron* deference.

        **B.**        **The USPS's Interpretation of the RSIA is Reasonable Because it Harmonizes the Internal Inconsistency of Section (g)(5)(C) with the Purpose of the RSIA.**

        39 U.S.C. § 5402 (g)(5)(C) is patently ambiguous because a new carrier may "immediately" receive tender of nonpriority mainline bypass mail under this provision on routes where no existing mainline passenger carrier is providing service, yet the provision also seems to require the carrier to meet the same 12-month prior service requirement from which it is exempted.  The "Notwithstanding" lead-in clause of Section (g)(5)(C) exempts from the requirements of Section (g)(5)(A) a new mainline passenger carrier seeking equitable tender. Section (g)(5)(A) contains only two requirements: (i) that a carrier meet the requirements of subsection (g)(1)(A)(iv)(II), *i.e.*, the 12-Month rule, and (ii) that a carrier provide at least 75% of the number of insured passenger seats as the number of available seats being provided by the

leading incumbent mainline passenger carrier, *i.e.*, the 75% rule. Plaintiffs concede that the 75% rule could never apply to a (g)(5)(C) situation because there are no mainline passenger carriers operating in those markets. *See* Plaintiffs' Supp. Br. at 7 ("[T]he notwithstanding clause in Section (g)(5)(C) indicates that when there is no 121 mainline passenger carrier operating in a market, Section (g)(5)(A)'s requirements are 'overridden' in favor of those set forth in Section (g)(5)(C)"). Similarly, the 12-Month Rule would not make sense in a (g)(5)(C) situation, where no mainline passenger carriers are operating. Nevertheless, Plaintiffs maintain that the 12-month requirement contained in Section (g)(5)(A), that is explicitly "overridden" by the notwithstanding clause, applies because the rest of Section (g)(5)(C) requires compliance with the 12-month rule contained in Section (g)(1)(A)(iv)(II). The rest of Section (g)(5)(C), however, contains many requirements, only one of which is the 12-Month Rule contained in Section (g)(1)(A)(iv)(II).

The USPS's interpretation of the RSIA, therefore, harmonizes the language in Section (g)(5)(C), giving effect to the "Notwithstanding" lead-in clause, the "immediately" language of Section (g)(5)(C), and the tail-end of that provision. Under the USPS's reading, a new mainline passenger carrier seeking equitable tender on a mainline route where no mainline passenger carrier is operating may "immediately" receive tender of nonpriority mainline bypass mail and begin providing passenger service to Alaskans if it satisfies the first three requirements of Section (g)(1)(A), *i.e.,* it holds a certificate of public convenience and necessity, and operates and adheres to a certain number of scheduled flights each week, and also satisfies any flight requirements established by the USPS under Section (g)(1)(C). There is no Section (g)(1)(D) in the current version of the RSIA, so there is no requirement to satisfy with respect to this Section. The USPS's interpretation resolves the internal inconsistency of (g)(5)(C) and gives effect to the

primary purpose of the RSIA – to provide Alaskans with reliable mail, non-mail freight, and passenger service. Plaintiffs' interpretation, on the other hand, would render both the "Notwithstanding" clause and the "immediately" language of Section (g)(5)(C) utterly meaningless. The USPS's interpretation, therefore, is a reasonable way to resolve the internal inconsistency of Section (g)(5)(C) and is entitled to deference from this Court.[5]

## IV.     Conclusion

For all these reasons, the Court should deny Plaintiffs' motion for declaratory judgment and grant Defendant's motion for summary judgment.

Dated: March 23, 2010             Respectfully submitted,

  _/s/_____
  RONALD C. MACHEN JR., D.C. BAR #447889
  United States Attorney

  __/s/_____
  RUDOLPH CONTRERAS, D.C. BAR # 434122
  Assistant United States Attorney

  __/s/_____
  MITCHELL P. ZEFF, D.C. BAR #494066
  Assistant United States Attorney
  555 Fourth St., N.W.
  Washington, D.C.  20530
  Phone: (202) 514-7352
  Fax: (202) 514-8780
  Email: Mitchell.Zeff@usdoj.gov

---

[5] If the Court is unable to determine on the current record whether the USPS's interpretation of Section (g)(5)(C) is reasonable, it is well within the Court's discretion to remand (without vacating) the case back to the USPS to provide further clarification of the reasoning it adopted in granting PenAir equitable tender to deliver mainline bypass mail on the five routes at issue.

Of Counsel

MICHELLE A. WINDMUELLER
Senior Litigation Counsel
United States Postal Service
475 L'Enfant Plaza, SW Room 6117
Washington, D.C. 20260
Phone: (202) 268-2064
Fax: (202) 268-6279
Email: Michelle.A.Windmueller@usps.gov Agency Counsel: