# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHERN AIR CARGO, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES POSTAL SERVICE, ) | Civil Action No. 09-2065(EGS) |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| PENINSULA AIRWAYS, INC., ) | |
| ) | |
| Defendant-Intervenor. ) | |

## MEMORANDUM OPINION

This case involves the decision of the United States Postal
Service (the "Postal Service") to grant an equitable tender of
nonpriority mainline bypass mail to Peninsula Airways, Inc.
("PenAir") on five mainline routes in rural Alaska pursuant to 39
U.S.C. § 5402(g)(5)(c) ("§ 5402(g)(5)(c)").  This equitable
tender is being challenged by three mainline carriers – Northern
Air Cargo ("NAC"), Tatonduk Outfitters Ltd d/b/a Everts Air Cargo
("Everts"), and Lynden Air Cargo LLC ("Lynden") (collectively,
"plaintiffs").  Plaintiffs seek declaratory and injunctive
relief.  Pending before the Court is plaintiffs' motion for
summary judgment, as well as cross-motions for summary judgment
filed by Defendant Postal Service and Defendant-Intervenor PenAir
(collectively, "defendants").  Upon consideration of the motions,

the responses and replies thereto, the applicable law, the entire record, the arguments of counsel made during the motions hearing held on February 23, 2010, the parties' post-argument briefs, and for the following reasons, the Court hereby **GRANTS IN PART AND DENIES IN PART** plaintiffs' motion for summary judgment and **GRANTS IN PART AND DENIES IN PART** defendants' cross-motions for summary judgment.

## I.  STATUTORY BACKGROUND

### A.  Intra-Alaska Bypass Mail System

The State of Alaska is the largest state in the Union and has a very limited system of roads connecting its communities. *See* Congressional Findings, Pub. L. 107-206 § 3002(b)(1) (Aug. 2, 2002).  The United States Government owns nearly 2/3 of Alaska's landmass, including large tracts of land separating isolated communities within the State.  *Id.* § 3002(b)(5).  This federal ownership has inhibited the ability of Alaskans to build roads connecting isolated communities.  *Id.* § 3002(b)(6). Consequently, most communities and a large portion of the population in the State can only be reached by air.  *Id.* § 3002(b)(7).  As a result, the vast majority of food items and everyday necessities destined for these isolated communities and populations can only be transported through the air.  *Id.* § 3002(b)(8).  To tackle the unique challenge of connecting

hundreds of rural and isolated communities within the State, Congress created the Intra-Alaska Bypass Mail system (the "bypass mail system"). *Id.* § 3002(b)(9).[1]

The bypass mail system provides for the carriage of items - ranging from foodstuffs to building materials to livestock - as mail, which elsewhere would be transported as freight. It also provides a means of affordable and reliable passenger service for rural Alaskans. Indeed, Congress describes the bypass mail system as a "4-legged stool," designed to: (1) "provide the most affordable means of delivering food and everyday necessities to these rural and isolated communities"; (2) "establish a system whereby the Postal Service can meet its obligations to deliver mail to every house and business in the United States"; (3) "support affordable and reliable passenger service"; and (4) "support affordable and reliable nonmail freight service." *Id.*

### B. Rural Service Improvement Act of 2002

In 2002, based upon its determination that some air carriers were abusing the bypass mail system, Congress enacted the Rural Service Improvement Act of 2002 (the "RSIA"). *See* Pls.' SMF ¶¶ 11-12; *see also* Congressional Findings, Pub. L. 107-206

---

[1] The Postal Service defines bypass mail as: "Standard mail that is prepared by an authorized bypass mail shipper which bypasses postal processing. It is tendered directly to an intra-Alaska air carrier for delivery directly to the addressee under prescribed guidelines and conditions." Postal Service's SOF ¶ 4.

§ 3002(b)(11) ("Attempts by Congress to support passenger and nonmail freight service in Alaska using the Intra-Alaska Bypass Mail system have yielded some positive results, but some carriers have been manipulating the system by carrying few, if any, passengers and little nonmail freight while earning most of their revenues from the carriage of nonpriority bypass mail.").  In passing the RSIA, Congress affirmed that "[a]s long as the Federal Government continues to own large tracts of land within the State of Alaska which impede access to isolated communities, it is in the best interest of the Postal Service, the residents of Alaska and the United States" to: (i) "ensure that the Intra-Alaska Bypass Mail system remains strong, viable, and affordable for the Postal Service"; (ii) "ensure that residents of rural and isolated communities in Alaska continue to have affordable, reliable, and safe passenger service"; (iii) "ensure that residents of rural and isolated communities in Alaska continue to have affordable, reliable, and safe nonmail freight service"; (iv) "encourage that intra-Alaska air carriers move toward safer, more secure, and more reliable air transportation . . . where such operations are supported by the needs of the community"; and (v) "ensure that the Intra-Alaska Bypass Mail system continues to be used to support substantial passenger and nonmail freight service and to reduce costs for the Postal Service."  Congressional Findings, Pub. L. 107-206 § 3002(b)(12).

To achieve these goals, the RSIA created basic tests and minimum eligibility requirements that carriers must satsify in order to be eligible to carry bypass mail. Specifically, the RSIA divides eligible carriers into two groups: (i) mainline bypass mail carriers; and (ii) bush bypass mail carriers. Mainline bypass mail carriers operate large aircrafts (greater than 7500 pound payload capacity) and fly "mainline routes" between either Anchorage or Fairbanks and a regional Alaska hub.[2] *See* 39 U.S.C. § 5402(a)(13). Bush bypass mail carriers, by contrast, operate smaller aircrafts (less than 7500 pound payload capacity) and fly "bush routes" between regional hubs and smaller, rural communities.[3] *Id.* § 5402(a)(4); *see also generally* Postal Service SOF ¶ 6 ("There are two types of eligible bypass mail carriers in Alaska's system and two corresponding types of mail rates available to those carriers: (1) the higher bush rate mail is distinguished by the size of the aircraft used to transport it – aircraft having a payload capacity up to and including 7,500 pounds, and (2) mainline rate

_____

[2] A mainline route is a city pair route in which a mainline carrier is tendered nonpriority mainline bypass mail. *See* 39 U.S.C. § 5402(a)(14). Mainline carriers must use aircraft certified to carry at least 19 passengers.

[3] A bush route is an air route in which a bush carrier is tendered nonpriority bush bypass mail. *See* 39 U.S.C. § 5402(a)(6). Bush carriers must use aircraft certified to carry at least 5 passengers.

mail is also distinguished by the size of the aircraft used to transport it – aircraft having a payload capacity over 7,500 pounds." (internal quotation marks omitted)).

At the time the RSIA was passed, only four carriers qualified as existing mainline carriers; those carriers are the three plaintiffs in this lawsuit – NAC, Everts, and Lynden – as well as Alaska Airlines.[4]  Pls.' SMF ¶ 17; *see also* 39 U.S.C. § 5402(a)(12) (defining the term "existing mainline carrier" as those carriers that met certain statutory criteria "on January 1, 2001").  PenAir was a bush bypass mail service carrier at that time.  *See* Pls.' SMF ¶ 70 (explaining that PenAir has been providing bush bypass mail service since approximately 1998); *see also* PenAir's Opp'n & Cross-Mot. at 10 (explaining that PenAir is one of the "largest and oldest airlines" in Alaska, which began operations over 50 years ago and currently employees more than 500 Alaskan residents).

## II.  FACTUAL BACKGROUND

### A.  PenAir's Request for Equitable Tender of Nonpriority Mainline Bypass Mail

As noted above, this case arises from the Postal Service's determination that PenAir was eligible for the equitable tender

---

[4]    Although Alaska Airlines is not a party to this suit, the airline did challenge the Postal Service's decision to grant PenAir an equitable tender of nonpriority mainline bypass mail by filing an objection with the Postal Service.  *See infra* Section II.B.

of nonpriority mainline bypass mail on five mainline routes:
Anchorage-Dillingham, Anchorage-King Salmon, Anchorage-Aniak,
Anchorage-McGrath, and Anchorage-Unalakleet. PenAir has
historically provided daily service to those communities using
its bush aircrafts. *See* PenAir's Opp'n & Cross-Mot. at 10.[5] Due
to the economic downturn in 2009, however, PenAir's ability to
continue to provide daily service to those communities became
less viable. PenAir's SMF ¶¶ 12-14. Rather than reduce services
to those communities, PenAir sought to become a new mainline
carrier on those routes in order to obtain an equitable tender of
nonpriority mainline bypass mail. *See* PenAir's SMF ¶ 15.[6]

Towards this end, by letters dated July 6, 2009 and July 22,
2009, PenAir applied to the Postal Service for an equitable
tender of nonpriority mainline bypass mail in the Anchorage-
Dillingham and Anchorage-King Salmon markets pursuant to 39
U.S.C. § 5402(g)(5)(C) – the statutory provision governing the

---

[5]    An "equitable tender" refers to "the practice of the Postal
Service of equitably distributing mail on a fair and reasonable
basis between those air carriers that offer equivalent services
and costs between 2 communities in accordance with the
regulations of the Postal Service." 39 U.S.C. § 5402(a)(11).

[6]    Bypass mail is an important subsidy for airline carriers in
Alaska. As former Senator Ted Stevens explained: "In addition to
ensuring delivery of food and goods, the bypass mail system
assured that passenger seats would be available to rural
Alaskans. The revenues paid to air carriers to transport the
bypass mail helps underwrite the cost of passenger service." 148
Cong. Rec. S7277 (July 24, 2002).

entry of new mainline passenger carriers on routes in which there is no existing mainline passenger carrier.[7] Pls.' SMF ¶¶ 52-54; *see also* Pls.' Exs. B and C to Declaration of David Karp ("Karp Decl.") (letters dated July 6, 2009 and July 22, 2009). By letter dated August 7, 2009, the Postal Service determined that PenAir was eligible for an equitable tender of mainline nonpriority bypass mail in those markets. Pls.' SMF ¶ 56. In its letter, the Postal Service explained:

> This replies to your letter of July 6, 2009, as supplemented by your letter of July 22, 2009, requesting the equitable tender of non-priority bypass mail as a new 121 mainline passenger carrier on the city-pair routes of Anchorage-Dillingham and Anchorage-King Salmon. Having reviewed the matter, we have concluded that your letters describe service which would make you eligible for the equitable tender you have requested in those markets.

Ex. A to Karp Decl. (letter dated August 7, 2009).

Thereafter, PenAir applied to the Postal Service for an equitable tender of nonpriority mainline bypass mail in the additional markets of Anchorage-Aniak, Anchorage-McGrath, and Anchorage-Unalakleet. Pls.' SMF ¶ 55; *see also* Postal Service's

---

[7] Section 5402(g)(5)(C) provides as follows: "Notwithstanding subparagraph (A) and paragraph (1)(B), a new 121 mainline passenger carrier, otherwise qualified under this subsection, may immediately receive equitable tender of nonpriority mainline bypass mail to a hub point in the State of Alaska if the carrier meets the requirements of subparagraphs (A), (C), and (D) of paragraph (1) and subsection (h)(2)(B) and -(i) all qualified 121 mainline passenger carriers discontinue service on the city pair route; or(ii) no 121 mainline passenger carrier serves the city pair route." 39 U.S.C. § 5402(g)(5)(C).

Ex. J to Declaration of Steve Deaton ("Deaton Decl.") (letter dated August 24, 2009).  By letter dated September 2, 2009, the Postal Service approved PenAir's request for equitable tender in these additional markets, concluding that "[PenAir's] letters describe service which would make [it] eligible for the equitable tender [it has] requested in those markets."  Ex. K to Deaton Decl. (letter dated Sept. 2, 2009).

On August 22, 2009, PenAir began operating as a mainline passenger carrier on the Anchorage-Dillingham, Anchorage-King Salmon, Anchorage-Aniak, Anchorage-McGrath, and Anchorage-Unalakleet routes.  PenAir's SMF ¶ 23.  Soon thereafter, on November 9, 2009, the Postal Service began tendering nonpriority mainline bypass mail to PenAir on all five routes.  PenAir's SMF ¶ 23.

**B.    Alaska Airline's Objection to the Postal Service's Determination Regarding PenAir**

After the Postal Service determined that PenAir was eligible for the equitable tender of nonpriority mainline bypass mail on the Anchorage-Dillingham and Anchorage-King Salmon routes, Alaska Airlines submitted a letter to the Postal Service expressing its "concern and differing viewpoint with the legal argumentation set forth in [PenAir's letter dated July 6, 2009]."  *See* PenAir's Ex. 4 to Declaration of Daniel Seybert ("Seybert Decl.") (letter dated August 12, 2009).  The letter then described, in detail,

the airline's objections to PenAir's statutory analysis as well as its own interpretation of 39 U.S.C. § 5402. Ex. 4 to Seybert Decl.

By letter dated September 2, 2009 – the same date that the Postal Service sent a letter approving the equitable tender of mainline bypass mail to PenAir on additional mainline routes – the Postal Service provided the following response to Alaska Airlines:

> This replies to your letter of August 12, 2009, expressing your concern of the equitable tender of non-priority mainline bypass mail to PenAir as a new 121 mainline passenger carrier on the city-pair routes of Anchorage-Dillingham, and Anchorage-King Salmon. Having reviewed the matter, we have concluded that the PenAir request describes service which would make PenAir eligible for the equitable tender in those markets. That conclusion is consistent with our understanding of 39 U.S.C. § 5402's requirements and the Congressional findings on which those requirements are based; if a carrier is entitled to equitable tender under the statute, cost and policy issues such as those your letter addresses are not for our consideration.

Ex. K. to Deaton Decl. (letter dated Sept. 2, 2009).

**C.   This Action**

This action initially came before the Court on November 3, 2009, as a motion for preliminary injunction against the Postal Service. During a telephonic status hearing on November 4, 2009, however, plaintiffs informed the Court that they consented to having their motion for preliminary injunction consolidated with a determination on the merits pursuant to Federal Rule of Civil

Procedure 65(a)(2).  *See* Minute Order dated Nov. 4, 2009.  The
Court was also informed during this telephonic status hearing
that PenAir planned to file a motion to intervene pursuant to
Federal Rule of Civil Procedure 24; this motion was granted on
November 6, 2009.  Plaintiffs then filed a motion for summary
judgment, and defendants filed cross-motions for summary
judgment.  These motions are now ripe for determination by the
Court.

## III. STANDARDS OF REVIEW

### A.    Summary Judgment

Summary judgment should be granted only if the moving party
has shown that there are no genuine issues of material fact and
that the moving party is entitled to judgment as a matter of law.
*See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317,
325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991
(D.C. Cir. 2002).  "A fact is material if it 'might affect the
outcome of the suit under the governing law,' and a dispute about
a material fact is genuine 'if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.'"
*Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The
party seeking summary judgment bears the initial burden of
demonstrating an absence of genuine issues of material fact.
*Celotex*, 477 U.S. at 322. In determining whether a genuine issue

of material facts exists, the Court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986); *Keyes v. Dist. of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *St. Michael's Med. Ctr. v. Sebelius*, 648 F. Supp. 2d 18, 25 (D.D.C. 2009) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

## B. The Postal Service's Interpretation of the RSIA

A challenge to an agency's construction of a statute that it administers is subject to the standard of review articulated in *Chevron U.S.A., Inc. v. NRDC*, *Inc.* 467 U.S. 837 (1984). In assessing the validity of an agency's interpretation of a statute, the Court must first determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842-43. Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1993), including an examination of the statute's text, structure, purpose, and legislative history. *See Shays v. FEC*, 414 F.3d 76, 105 (D.C. Cir. 2005). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as

the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In making such an assessment, "considerable weight" is generally accorded to "an executive department's construction of a statutory scheme it is entrusted to administer[.]" *Id.* Indeed, "under *Chevron*, courts are bound to uphold an agency interpretation as long as it is reasonable – regardless whether there may be other reasonable, or even more reasonable, views." *Serono Labs.,* 158 F.3d at 1321.

## IV. ANALYSIS

### A. Jurisdictional Inquiry

As a threshold matter, the Postal Service argues that the Court lacks subject matter jurisdiction over this action. In support of its argument, the Postal Service points to 39 U.S.C. § 410(a), which provides for judicial review of a Postal Service action only when the Postal Service is alleged to have exceeded its statutory authority.[8] *See* Postal Service's Opp'n & Cross-

---

[8]     39 U.S.C. § 410(a) states, in relevant part, that "except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service."

13

Mot. at 6-7. The Postal Service argues that because plaintiffs are only challenging the Postal Service's "interpretation of the eligibility requirements of § 5402(g)(5)(C) as applied to PenAir" – and not the Postal Service's "authority to grant equitable tender to an airline under 39 U.S.C. § 5402(g)(5)(C) or that it passed a regulation that directly contradicts the plain meaning of the statute" – plaintiffs' claims are barred by 39 U.S.C. § 410(a). *See* Postal Service's Opp'n & Cross-Mot. at 10; *see also* Postal Service's Opp'n & Cross-Mot. at 7 (arguing that § 410(a) "exempt[s] most Postal Service actions – including ones such as this, where the Postal Service acted entirely within the scope of its statutory authority, from judicial review").

Plaintiffs, relying principally on *Aid Association for Lutherans v. United States Postal Service*, 321 F.3d 1166 (D.C. Cir. 2003), contend that "judicial review is favored when an agency is charged with acting beyond its authority." *Id.* at 1172 (internal quotation marks omitted). Plaintiffs therefore assert that this Court has jurisdiction to determine whether the Postal Service exceeded its statutory authority by granting equitable tender of mainline bypass mail to an air carrier that does not satisfy the specific eligibility requirements established by Congress under § 5402(g)(5)(C). *See* Pls.' Combined Reply & Opp'n Br. at 5. This Court agrees.

"[T]he case law in this circuit is clear that judicial review is available when an agency acts *ultra vires*" because "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on [its] authority." *Aid Ass'n for Lutherans*, 321 F.3d at 1173 (internal quotation marks omitted). Therefore, because plaintiffs assert that the Postal Service exceeded its statutory authority in purporting to apply § 5402(g)(5)(C), this Court has jurisdiction over the pending action. *See, e.g.*, *id.* ("Appellees' claims here, that the Postal Service 'exceeded its statutory authority' in purporting to apply the statute, clearly admit of judicial review.").

**B.   The Postal Service's Determination that PenAir Qualified for Equitable Tender of Nonpriority Mainline Bypass Mail Pursuant to § 5402(g)(5)(C)**

As discussed above, the Court's analysis of the validity of the Postal Service's interpretation of § 5402(g)(5)(C) is governed by *Chevron*, 467 U.S. 837. Plaintiffs argue that this case should be decided under *Chevron* step one as the Postal Service's decision to tender nonpriority mainline bypass mail to PenAir was in direct contradiction with the "clear and unambiguous language" of § 5402(g)(5)(C) and is therefore *ultra vires*. In support of their request for summary judgment, plaintiffs put forth two principal arguments. First, plaintiffs argue that the Postal Service exceeded its statutory authority in granting PenAir's request for equitable tender because PenAir had

15

not operated an aircraft having a payload capacity of greater than 7500 pounds for 12 consecutive months (the "Prior Service and Capacity Requirement"), and therefore failed to satisfy § 5402(g)(1)(A)(iv)(II) as required by § 5402(g)(5)(C). Second, plaintiffs argue that PenAir provided nonpriority bypass mail before January 1, 2001, and therefore cannot qualify as a "new 121 mainline passenger carrier" under § 5402(g)(5)(C). *See* 39 U.S.C. § 5402(a)(15) (defining a "new" carrier as one that "began providing nonpriority bypass mail service on a city pair route in the State of Alaska after January 1, 2001"). The Court will explore plaintiffs' arguments in turn.

### 1. The Prior Service and Capacity Requirement of § 5402(g)(1)(A)(iv)(II)

Section 5402(g)(5)(C), the new mainline carrier entry provision that the Postal Service relied upon in granting equitable tender of nonpriority mainline bypass mail to PenAir, states:

> Notwithstanding subparagraph (A) and paragraph (1)(B), a new 121 mainline passenger carrier, otherwise qualified under this subsection, may immediately receive equitable tender of nonpriority mainline bypass mail to a hub point in the State of Alaska if the carrier meets the requirements of subparagraphs (A), (C), and (D) of paragraph (1) and subsection (h)(2)(B) and --
> (i) all qualified 121 mainline passenger carriers discontinue service on the city pair route; or
> (ii) no 121 mainline passenger carrier serves the city pair route.

16

39 U.S.C. § 5402(g)(5)(C).

As a threshold matter, there is no dispute that PenAir satisfies subparts (i) through (iii) of § 5402(g)(1)(A). Nor is there any dispute that PenAir satisfies § 5402(g)(1)(C) or § 5402(h)(2)(B).[9] The issue the Court must resolve, therefore, is whether PenAir was required to satisfy the Prior Service and Capacity Requirement of § 5402(g)(1)(A)(iv)(II) prior to being granted an equitable tender of nonpriority mainline bypass mail. This provision requires a carrier to "have provided scheduled service with at least the number of scheduled noncontract flights each week established under subparagraph (B)(ii) between 2 points within the State of Alaska for at least 12 consecutive months with aircraft . . . over 7,500 pounds payload capacity before being selected as a carrier of nonpriority bypass mail at the intra-Alaska mainline service mail rate." 39 U.S.C. § 5402(g)(1)(A)(iv)(II).

Plaintiffs argue that the plain language of § 5402(g)(5)(C) requires PenAir to comply with § 5402(g)(1)(A)(iv)(II) in order to be eligible to receive an equitable tender of nonpriority mainline bypass mail. Pls.' Mot. at 13-14. Because it is undisputed that PenAir had not satisfied this requirement at the

---

[9]     Due to a legislative drafting error, there is no subparagraph D of paragraph (1) for PenAir to satisfy.

time the Postal Service rendered its decision,[10] plaintiffs assert that it was *ultra vires* for the Postal Service to assign PenAir an equitable tender of nonpriority mainline bypass mail.

Defendants respond by arguing that the Postal Service's decision to grant an equitable tender of nonpriority mainline bypass mail to PenAir was based on a reasonable interpretation of § 5402(g)(5)(C). Specifically, defendants point to the "notwithstanding" clause in § 5402(g)(5)(C). The "notwithstanding" clause, they argue, directs the Postal Service *not* to apply the requirements of § 5402(g)(5)(A), which, in turn, requires a carrier to "meet the requirements of subsection (g)(1)(A)(iv)(II)." 39 U.S.C. § 5402(g)(5)(A)(i). Accordingly, it is defendants' position that subparagraph (g)(1)(A)(iv)(II) does not apply to carriers under § 5402(g)(5)(C), and is to be disregarded for purposes of a determination under § 5402(g)(5)(C). *See* Postal Service's Opp'n & Cross-Mot. at 13, 16 (explaining that "the 'notwithstanding' language in the lead-in clause to § 5402(g)(5)(C) . . . allows equitable tender if all

---

[10] *See* Postal Service's Reply Br. at 11 ("There is no dispute that PenAir does not meet [the 12-Month] requirement[.]"); *see also* PenAir SOF ¶ 8 ("Prior to August 22, 2009, PenAir only operated aircraft having a payload capacity of under 7,500 lbs., which qualified as 'bush' aircraft."); Postal Service's SOF ¶¶ 7-8 ("Prior to August 22, 2009, PenAir operated as one of the largest 'bush' carriers in the State of Alaska, with a fleet of aircraft with payload capacity under 7,500 lbs . . . . Subsequent to August 22, 2009, PenAir began utilizing aircraft with a payload capacity over 7,500 lbs.").

other qualifications are met, 'notwithstanding the requirements' of § 5402(g)(5)(A)"; concluding that the only way to give effect to § 5402(g)(5)(C), "is to exclude *all* of the requirements of (g)(5)(A), including the [Prior Service and Capacity Requirement] of (g)(1)(A)(iv)(II)"); PenAir's Opp'n & Cross-Mot. at 16 ("[T]here is a perfectly good reason why the Postal Service did not apply the [Prior Service and Capacity Requirement] set forth in subsection (g)(1)(A)(iv)(II) to PenAir: Congress expressly exempted carriers like PenAir from that very specific statutory mandate in [§ 5402(g)(5)(C)] through the 'Notwithstanding' clause.").

In further support of their interpretation, defendants point to the term "immediately" in § 5402(g)(5)(C), and explain that "[i]t makes sense that a carrier seeking to 'immediately' deliver mainline bypass mail and provide mainline passenger service on a route *where no existing mainline passenger carrier is operating* would not have to abide by the twelve month capacity requirement of § 5402(g)(1)(A)(iv)(II) or the sixth month passenger requirement of Section (g)(5)(A)(ii)."  Postal Service's Opp'n & Cross-Mot. at 14.  Likewise, PenAir asserts that "[t]he word 'immediately' means 'occurring without delay[.]'"  PenAir's Opp'n & Cross-Mot. at 24 (quoting Black's Law Dictionary 751 (8th ed. 2000)).  PenAir explains that "Congress did not use that modifier in any of the other generally applicable RSIA provisions

regarding the tender of nonpriority bypass mail," but instead

chose to "reserve[ ] the word 'immediately' to underscore its

intention – expressed in no uncertain terms through the

'Notwithstanding' clause – that new carriers need not satisfy the

generally applicable [Prior Service and Capacity Requirement]

under [§ 5402(g)(5)(C)]."  PenAir's Opp'n & Cross-Mot. at 24.[11]

Plaintiffs urge the Court to reject these arguments.  With

regards to the "notwithstanding" clause, plaintiffs assert that

"the 'notwithstanding' language in Section (g)(5)(C) merely

specifies that Section (g)(5)(C) – and not Section (g)(5)(A) –

governs the circumstances under which a new 121 mainline

passenger carrier can qualify to receive equitable tender of

---

[11]    This reading of "immediately" finds some support in the congressional testimony of former Senator Ted Stevens.  *See* 148 Cong. Rec. S7278 (July 24, 2002) ("Under this act, a new passenger carrier may immediately be tendered bypass mail on a mainline route if all passenger carriers operating under Federal Aviation Rules part 121 leave the market or no part 121 passenger service is available.  These provisions mean that under such conditions a new 121 carrier will not have to wait 6 months to provide services.  It will get bypass mail immediately in mainline markets with no passenger service.  This change will provide mainline communities with quality passenger service as mail revenues underwrite passenger transportation.").  *But see* Pl.'s Combined Reply & Opp'n Br. at 18 n.10 (explaining that this statement "refers to the unique requirement in Section (g)(5)(A) that a carrier provide at least 75 percent of the number of insured passenger seats as the number of available passenger seats being provided by the mainline passenger carrier providing the greatest number of available passenger seats on that route 'for the 6 months immediately preceding the date on which the carrier seeks tender of such mail'" (quoting 39 U.S.C. § 5402(g)(5)(A))).

Mainline Mail where there is no 121 mainline passenger carrier offering service on the city pair route at issue." Pls.' Combined Reply & Opp'n Br. at 9.[12] Explaining that the ordinary meaning of notwithstanding is "despite," "in spite of," or "irrespective," *see* Pls.' Combined Reply & Opp'n Br. at 12 (citing Black's Law Dictionary and various cases), plaintiffs urge the Court to give "notwithstanding" its common meaning. *See* Pls.' Combined Reply & Opp'n Br. at 12-13 ("[N]otwithstanding does not 'expressly direct the Postal Service not to apply the [Prior Service and Capacity Requirement].' Rather, it provides that 'irrespective' of any requirements that a carrier would have to satisfy to receive Mainline Mail under Subparagraph (A), a carrier may receive equitable tender of Mainline Mail under Subparagraph (C) if it satisfies all of the requirements set forth in Subparagraph (C)." (quoting PenAir's Opp'n & Cross-Mot.

---

[12]    Plaintiffs also point out an important distinction between the requirement set forth in § 5402(g)(1)(A)(iv)(II) and the requirement a carrier must satisfy under § 5402(g)(5)(A). Plaintiffs explain that: "[T]he Prior Service and Capacity Requirement set forth in Section (g)(1)(A)(iv)(II) *only* requires that a carrier provide scheduled service between any two points in the State of Alaska for 12 consecutive months with aircraft having over 7500 pounds payload capacity . . . Thus, unlike the requirements to receive equitable tender of Mainline Mail under Section (g)(5)(A), a new 121 mainline passenger carrier seeking equitable tender of Mainline Mail under Section (g)(5)(C) does not have to operate aircraft with over 7,500 pounds of payload capacity for 12 consecutive months *on the specific city pair route for which it is seeking equitable tender of Mainline Mail.* Instead, the carrier simply has to operate such aircraft for 12 consecutive months between any two points in the State of Alaska." Pls.' Combined Reply & Opp'n Br. at 10.

at 12)). Plaintiffs also argue that by reading the
"notwithstanding" clause in isolation, defendants render part of
§ 5402(g)(5)(C) meaningless, "thereby violating critical canons
of statutory interpretation." Pls.' Combined Reply & Opp'n Br.
at 11; *see also, e.g.*, *Corley v. United States*, 129 S. Ct. 1558,
1566 (2009) (rejecting the government's statutory interpretation
which was "at odds with one of the most basic interpretative
canons, that 'a statute should be construed so that effect is
given to all its provisions so that no part will be inoperative
or superfluous, void or insignificant . . . .'" (quoting *Hibbs v.
Winn*, 542 U.S. 88, 101 (2004))).

In addition, with regards to defendants' interpretation of
the word "immediately," plaintiffs assert that "[t]he word
'immediately' – read in the context of Section (g)(5)(C) and the
rest of the RSIA – does not exempt a carrier seeking to qualify
under Section (g)(5)(C) from satisfying all of the eligibility
requirements that Congress explicitly enumerated in that
section[.]" Pls.' Combined Reply & Opp'n Br. at 18. To the
contrary, plaintiffs argue that § 5402(g)(5)(C) clearly
specifies, without qualification, that "'a new 121 mainline
passenger carrier, *otherwise qualified under this subsection*, may
immediately receive equitable tender . . . *if* the carrier meets
the requirements of *subparagraphs (A)*, (C), and (D) of paragraph
(1) and subsection (h)(2)(B).'" Pls.' Combined Reply & Opp'n Br.

at 18 (quoting 39 U.S.C. § 5402(g)(5)(C)) (emphasis in plaintiffs' brief).

Having closely considered the arguments of both plaintiffs and defendants, the Court finds that the Postal Service impermissibly disregarded the plain language of § 5402(g)(5)(C) in determining that PenAir was not required to satisfy the Prior Service and Capacity Requirement set forth in § 5402(g)(1)(A)(iv)(II). Congress clearly stated that a new mainline carrier must "meet[ ] the requirements of subparagraph[] (A) . . . of paragraph (1)," which includes § 5402(g)(1)(A)(iv)(II), in order to be eligible to "receive equitable tender of nonpriority mainline bypass mail." 39 U.S.C. § 5402(g)(5)(C). The Court, therefore, is unpersuaded by defendants' attempts to create an ambiguity where none exists.[13]

---

[13] Because "Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842-43, the Court need not defer to the Postal Service's interpretation of the RSIA. As the D.C. Circuit has counseled – "[w]hen the words of a statute are unambiguous . . . judicial inquiry is complete." *Teva Pharm. Indus. v. Crawford*, 410 F.3d 51, 53 (D.C. Cir. 2005)(internal quotation marks omitted). However, even assuming, *arguendo*, that the plain language of § 5402(g)(5)(C) is "ambiguous," the Court is not persuaded that the Postal Service's interpretation of § 5402(g)(5)(C) is entitled to deference under either *Chevron* or *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (explaining that if *Chevron* deference is not appropriate, courts may still accord an informal agency determination some deference under *Skidmore*; noting, however, that *Skidmore* deference is appropriate "only to the extent that those interpretations have the 'power to persuade'"). In determining that PenAir satisfied § 5402(g)(5)(C), the Postal Service simply stated that "[h]aving reviewed the matter, we have concluded that your letters describe

While the Court is sympathetic to defendants' position – and
indeed finds it perverse that this decision could have a negative
impact on passenger service in Dillingham, King Salmon, Aniak,
McGrath, and Unalakleet – the Court "'must presume that a
legislature says in a statute what it means and means in a
statute what it says[.]'" *Teva Pharm. Indus. v. Crawford*, 410
F.3d 51, 53 (D.C. Cir. 2005) (quoting *Conn. Nat'l Bank v.
Germain*, 503 U.S. 249, 253-54 (1992)). In this case, therefore,
the Court must presume that Congress intended new carriers to
satisfy the Prior Service and Capacity Requirement set forth in
§ 5402(g)(1)(A)(iv)(II) in order to receive an equitable tender
of nonpriority mainline bypass mail despite its potentially harsh
outcome. *See Lamie v. United States Trustee*, 540 U.S. 526, 538
(2004) (discussing "'deference to the supremacy of the

---

service which would make you eligible for the equitable tender
you have requested in those markets." *See* Ex. A to Karp Decl.;
Ex. K to Deaton Decl. This vague assertion fails to reflect any
deliberative process; the Court is left with no indication of who
the decision-makers were, what they considered, or how they
reached their decision. The Court finds that this lack of
thoughtful deliberation undermines defendants' claims of
deference. *See, e.g.*, *New York State Bar Assoc. v. FTC*, 276 F.
Supp. 2d 110, 138-39 (D.D.C. 2003) (Walton, J.) (concluding that
an agency's interpretation was "beyond the '*Chevron* pale,'" due
to the agency's "total lack of a deliberative process";
emphasizing that "the vagueness of the Opinion Letter reflects a
complete lack of any thoughtful deliberations"). Nor is the
Court persuaded that the Postal Service reasonably interpreted
§ 5402(g)(5)(C). Simply put, there is nothing in the RSIA to
indicate that Congress empowered the Postal Service to exempt a
carrier from the requirements it set forth in § 5402(g)(5)(C).

Legislature,'" and explaining that courts may not "soften the import of Congress' chosen words even if [they] believe the words lead to a harsh outcome" (quoting *United States v. Locke*, 471 U.S. 84, 95 (1985))).

Accordingly, the Court concludes that the Postal Service exceeded its statutory authority by granting an equitable tender of nonpriority mainline bypass mail to PenAir pursuant to § 5402(g)(5)(C) despite the carrier's failure to satisfy § 5402(g)(1)(A)(iv)(II). The Court, therefore, **GRANTS** plaintiffs' request for summary judgment on this issue, and **DENIES** defendants' requests for summary judgment on this issue.

### 2. New Carrier Provision of § 5402(a)(15)

Next, plaintiffs argue that the Postal Service exceeded its authority in granting an equitable tender of nonpriority mainline bypass mail to PenAir because PenAir cannot qualify as a "new 121 mainline passenger carrier" as required by § 5402(g)(5)(C). In support of this argument, plaintiffs point to § 5402(a)(15), which states:

> [T]he term "new", when referencing a carrier, means a carrier that –
> (A) meets the respective requirements of subclause (I) or (II) of subsection (g)(1)(A)(iv), depending on the type of route being served and the size of aircraft being used to provide service;
> (B) began providing nonpriority bypass mail service on a city pair route in the State of Alaska after January 1, 2001; and

> (C) is not comprised of previously qualified
> existing mainline carriers as a result of merger or
> sale.

39 U.S.C. § 5402(a)(15); *see* Pls.' Mot. at 19-20. Plaintiffs argue that PenAir cannot satisfy subparagraph (B) of this provision because PenAir did not begin "providing nonpriority bypass mail service on a city pair route in the State of Alaska after January 1, 2001." 39 U.S.C. § 5402(a)(15)(B).[14]

Defendants respond by arguing that it is "absurd and defies common sense" to interpret § 5402(a)(15)(B) as permanently barring PenAir from qualifying as a new *mainline* passenger carrier simply because it carried *bush* bypass mail before January 1, 2001. In support of their argument, defendants explain that the word "new" is an adjective that must be read to modify the noun to which it refers. *See* Postal Service's Opp'n & Cross-Mot. at 14; PenAir's Opp'n & Cross-Mot. at 30-31. Defendants assert that because § 5402 provides for separate definitions of "121 bush passenger carrier" and "121 mainline passenger carrier," *see* 39 U.S.C. § 5402(20)-(21), the "new" assessment should be conducted in reference to the particular noun that it is

---

[14]    It is plaintiffs' position that PenAir can never qualify as a "new 121 mainline passenger carrier" as required by § 5402(g)(5)(C). *See* Pls.' Post-Argument Br. at 1 ("During the hearing, the Court queried whether 'Congress really intend[ed] that PenAir forever be excluded' from carrying mainline bypass mail. In short, yes. Congress intended to exclude all carriers of bypass mail before January 1, 2001 from being considered 'new' carriers under 39 U.S.C. § 5402." (internal citations omitted)).

modifying.[15] Accordingly, under defendants' desired interpretation, a carrier may qualify as a "new 121 *mainline* passenger carrier" as long as the carrier did not provide *mainline* bypass mail prior to January 1, 2001.[16] PenAir's Opp'n & Cross-Mot. at 31. Defendants explain that "[t]his interpretation recognizes that the definition of new requires application of the *respective* requirements based on the type of route being served and the size of the aircraft being used" - i.e., bush or mainline. *See* PenAir's Opp'n & Cross-Mot. at 31.

Defendants also assert that the definition of "existing mainline carrier" supports their statutory interpretation. An "existing mainline carrier" is defined, in relevant part, as a carrier "that on January 1, 2001, was . . . qualified to provide mainline nonpriority bypass mail service." 39 U.S.C. § 5402(a)(12). Defendants argue that it makes sense, then, that a "new 121 mainline passenger carrier" would be a carrier that

---

[15]     As defendant-intervenor PenAir explains: "[This] makes good sense, given the structure of the RSIA. The RSIA refers throughout to both 'new' mainline carriers, *see, e.g.*, § 5402(g)(5)(C), and 'new' bush carriers, *see, e.g.*, § 5402(h)(3)(A). Although Congress could have provided separate definitions for each type of 'new' carrier, it opted instead for a single flexible definition of 'new,' one that would adapt to whichever carrier was being modified." PenAir's Post-Argument Br. at 1-2.

[16]     Likewise, a carrier could qualify as a new *bush* passenger carrier as long as the carrier did not provide *bush* bypass mail after January 1, 2001.

27

was qualified to provide *mainline* nonpriority bypass mail service after January 1, 2001. PenAir's Reply Br. at 21. This Court agrees.

When viewing the RSIA as a whole, the Court finds that defendants' proffered definition of a "new 121 mainline passenger carrier" as a carrier that began providing nonpriority mainline bypass mail service on a city pair route in the State of Alaska after January 1, 2001, harmonizes the definition of "new" with the overall structure of the statute. *See, e.g.*, *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (recognizing that "'the meaning of statutory language, plain or not, depends on context'" (quoting *Bailey v. U.S.*, 116 S. Ct. 501, 506 (1995))); *see also Lanier v. District of Columbia*, 871 F. Supp. 20, 22 (D.D.C. 1994) ("In analyzing the meaning to be attached to particular phrases, it is necessary to view the statute as a whole, informed by the overall purpose and objective."). Specifically, because the word "new" must be read in context with the type of aircraft that applies – i.e., a mainline carrier or a bush carrier – it logically follows that the phrase "began providing nonpriority bypass mail" should be read in context to refer to the particular type of nonpriority bypass mail that the new carrier is seeking to carry – i.e., mainline bypass mail or

28

bush bypass mail.[17]

Accordingly, because PenAir did not transport nonpriority mainline bypass mail prior to January 1, 2001, the Court concludes that the Postal Service did not exceed its statutory authority in determining that PenAir could qualify as a "new 121 mainline passenger carrier" under § 5402(g)(5)(C). The Court, therefore, **GRANTS** defendants' requests for summary judgment on this issue, and **DENIES** plaintiffs' request for summary judgment on this issue.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** plaintiffs' motion for summary judgment and **GRANTS PART AND DENIES IN PART** defendants' cross-motions for summary

---

[17]    Moreover, despite plaintiffs' protestations to the contrary, *see* Pls.' Post-Argument Br. at 1-5, this Court is not persuaded that Congress intended its definition of "new" to impose a permanent bar preventing a carrier from ever qualifying as a "new 121 mainline passenger carrier" simply because the carrier provided bush bypass mail service prior to January 1, 2001. *See* Postal Service's Post-Argument Br. at 2 (explaining that "the plain language of the RSIA establishes that Congress had no intention of permanently excluding bush carriers from mainline markets, and vice versa" (citing 39 U.S.C. §§ 5402(g)(2)(C), 5402(g)(2)(D))). To the contrary, the only carrier that Congress explicitly barred from qualifying as a "new" carrier was a previously qualified existing mainline carrier. *See* 39 U.S.C. § 5402(a)(15)(C) ("[T]he term 'new,' when referencing a carrier, means a carrier that − . . . (C) is not comprised of previously qualified existing mainline carriers as a result of merger or sale[.]").

judgment.  Specifically, the Court finds that the Postal Service exceeded its statutory authority in granting an equitable tender of nonpriority mainline bypass mail to PenAir despite the carrier's failure to satisfy the Prior Service and Capacity Requirement of § 5402(g)(1)(A)(iv)(II).  The Court, therefore, **GRANTS** plaintiffs' request for summary judgment on this issue and **DENIES** defendants' requests for summary judgment on this issue. The Court finds that the Postal Service did not, however, exceed its statutory authority in determining that PenAir could qualify as a "new 121 mainline passenger carrier" under § 5402(g)(5)(C). Accordingly, the Court **GRANTS** defendants' requests for summary judgment on this issue, and **DENIES** plaintiffs' request for summary judgment on this issue.  An appropriate Order accompanies this Memorandum Opinion.

**SIGNED:**      **Emmet G. Sullivan**
              **United States District Court Judge**
              **September 23, 2010**